[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 18-13894

_____

RAY CHARLES SCHULTZ, et al.,

Plaintiffs,

BRADLEY HESTER,

Plaintiff-Appellee,

versus

STATE OF ALABAMA, et al.,

Defendants,

MATTHEW GENTRY,
Sheriff of Cullman County, Alabama,

in official and individual capacity,

AMY BLACK,

in her official capacity as a Magistrate,

LISA MCSWAIN,

in her official capacity as a Magistrate,

JUDGE J. CHAD FLOYD,

JUDGE RUSTY TURNER,

                                        Defendants-Appellants.

_____

Appeals from the United States District Court
for the Northern District of Alabama

D.C. Docket No. 5:17-cv-00270-MHH

_____

Before ROSENBAUM, LAGOA, and ANDERSON, Circuit Judges.

LAGOA, Circuit Judge:

Cullman County, Alabama, maintains a bail system that, until recently, was commonplace throughout the country. When arrested, the accused is assessed an amount of bail based on a bail schedule. Those who can pay the amount are immediately released. Those who cannot afford to post bail, however, are detained for a short time period until they can appear at a bail hearing.

At that bail hearing, the arrestee must prove his inability to post bail and show that he is not a flight risk or a danger to the community in order to secure his release.

Today, we are asked to assess the constitutionality of this ubiquitous system. Bradley Hester, on behalf of a class of similarly situated pretrial detainees, argues that the bail system is unconstitutional because it discriminates against the indigent, both by absolutely depriving them of pretrial release and by depriving them of due process at their bail hearings. In the district court, Hester moved for a preliminary injunction on both grounds. The district court agreed with his position and enjoined the Sheriff of Cullman County from continuing to operate its bail system as written, essentially guaranteeing indigent arrestees immediate pretrial release. This appeal followed.

## I.    FACTUAL AND PROCEDURAL HISTORY

The factual background of this case is long and complicated. When Hester was first arrested and detained, Cullman County maintained a bail system that is no longer in effect. On March 26, 2018—after Hester filed his complaint but before the district court issued its preliminary injunction—Cullman County adopted a new bail system, as memorialized in what we will refer to as the "Standing Bail Order." The Standing Bail Order is the bail system at issue in this case.

We will thus summarize the facts in four parts. *First*, we describe the relevant provisions of Alabama law at issue. *Second*,

we describe Cullman County's prior bail system—i.e., the bail system in place before March 26, 2018. *Third*, we detail the changes Cullman County made to its bail system upon the issuance of the Standing Bail Order. *Fourth*, we summarize Hester's arrest and the resulting procedural history of this case.

Under Alabama law, all arrestees not charged with capital murder have the statutory right to bail. *See* Ala. Code §§ 15-13-106 to -108. The purposes of setting bail are obvious: getting defendants to appear for court proceedings and ensuring public safety. *See* Ala. R. Crim. P. 7.2(a) (noting that conditions of pretrial release should "reasonably assure the defendant's appearance" at court proceedings and protect "the public at large" from "real and present danger").

Alabama Rule of Criminal Procedure 7.2(a) establishes the framework for the right to bail and specifies the factors to be considered when conducting an individualized bail determination:

> Rule 7.2. Right to release on one's personal recognizance or on bond.
>
> (a) **Before Conviction.** Any defendant charged with an offense bailable as a matter of right may be released pending or during trial on his or her personal recognizance or on an appearance bond unless the court or magistrate determines that such a release will not reasonably assure the defendant's appearance as required, or that the defendant's being at large will pose a real and present danger to others or to the public at large. If such a determination is made, the court

may impose the least onerous condition or conditions contained in Rule 7.3(b) that will reasonably assure the defendant's appearance or that will eliminate or minimize the risk of harm to others or to the public at large. In making such a determination, the court may take into account the following:

> 1. The age, background and family ties, relationships and circumstances of the defendant.

> 2. The defendant's reputation, character, and health.

> 3. The defendant's prior criminal record, including prior releases on recognizance or on secured appearance bonds, and other pending cases.

> 4. The identity of responsible members of the community who will vouch for the defendant's reliability.

> 5. Violence or lack of violence in the alleged commission of the offense.

> 6. The nature of the offense charged, the apparent probability of conviction, and the likely sentence, insofar as these factors are relevant to the risk of nonappearance.

> 7. The type of weapon used, e.g., knife, pistol, shotgun, sawed-off shotgun.

> 8. Threats made against victims and/or witnesses.

6                    Opinion of the Court                    18-13894

9. The value of property taken during the alleged commission of the offense.

10. Whether the property allegedly taken was recovered or not; damage or lack of damage to property allegedly taken.

11. Residence of the defendant, including consideration of real property ownership, and length of residence in his or her place of domicile.

12. In cases where the defendant is charged with a drug offense, evidence of selling or pusher activity should indicate a substantial increase in the amount of bond.

13. Consideration of the defendant's employment status and history, the location of defendant's employment, e.g., whether employed in the county where the alleged offense occurred, and the defendant's financial condition.

14. Any enhancement statutes related to the charged offense.

Ala R. Crim. P. 7.2(a).

Individuals in Cullman County can be arrested in one of two ways—pursuant to a warrant or pursuant to a warrantless probable cause arrest. For individuals arrested pursuant to a warrant issued by one of the County's magistrate judges, those judges set the initial bail amount in the warrant. For individuals arrested without a warrant, the Cullman County Sheriff's Office sets the initial bail

amount. In Cullman County, both before and after the Standing Bail Order went into effect, bail was initially assessed under a Master Bail Schedule that matched an amount of bail with a particular criminal offense.

Because many individuals do not have liquid assets in an amount sufficient to satisfy the bail schedule, Cullman County also has a bonding process that allows arrestees to post bail. Arrestees can post either property bonds or surety bonds to make bail. In the case of property bonds, the arrestee posts either real or chattel property as collateral for his bail. With surety bonds, the arrestee contacts a bonding company and works out an arrangement by which he pays a fee or percentage of his bail to the bonding company, which then posts bail in the full amount.

Before March 26, 2018, the Cullman County bail schedule matched specific criminal offenses with a range of bail that could be assessed. When an individual was arrested without a warrant, the Sheriff's Office would set bail under that schedule based on the crime charged. Those individuals who could post bail through a secured bond were immediately released, while those who could not afford to post bail were detained until a magistrate judge could conduct an initial appearance. At that initial appearance, the magistrate judge would explain the basis of the bail amount set but was not permitted to evaluate the bail amount or determine whether it exceeded the amount necessary to satisfy the purposes of bail. After that bail hearing, an arrestee could move to have his bail

amount reconsidered, which would then be heard by a district judge in Cullman County.

The parties disputed the efficacy of this now-defunct bail system. According to Alacourt—Alabama's electronic court monitoring system—around 34% of arrestees in February 2018 could not secure their release by posting bond within seventy-two hours of arrest. And of that group, Alacourt explained that a substantial percentage did not receive their initial appearance within the seventy-two hours prescribed by Alabama law. The Defendants, however, contended that Alacourt did not contain all relevant information and sometimes experienced substantial lag time in updating. According to them, the number of February 2018 arrestees who were released without the need of an initial appearance was 76%. But, according to the Defendants, a number of arrestees who ultimately did not post bond were ineligible for release anyway due to either a new probable cause arrest or a warrant for failure to appear.

On March 26, 2018, the presiding circuit judge of Cullman County issued a new "Standing Order Regarding Pre-Trial Appearance and the Setting of Bond." This Standing Bail Order set new policies for the County, including providing a new bail schedule that specified specific bail amounts (rather than a range) for specific crimes. Some bail amounts were also lower than in the previous system.

The Standing Bail Order prescribed new procedures for administering bail. As with the previous system, arrestees who could afford to pay the bail amount imposed upon arrest would be

immediately released—usually within ninety minutes or so of arriving at the Sheriff's Office. But if the Sheriff believed that the amount in the bail schedule was insufficient for serving the purposes of bail—i.e., if the Sheriff believed that the arrestee posed a risk of flight or danger to the community that did not match the amount of bail prescribed by the schedule—the Standing Bail Order allowed the Sheriff to submit a "Bail Request Form." If such a form was submitted, the arrestee—regardless of ability to pay—would be held by the Sheriff's Office until a magistrate judge could hold an initial appearance, at which time the magistrate judge would conduct an individualized determination of the conditions and release, and either grant the Sheriff's bail request (setting an amount higher than prescribed in the schedule) or deny the bail request (and thus fall back on the amount prescribed in the schedule). The Standing Bail Order requires that such a hearing will take place within seventy-two hours of arrest. If the hearing does not take place within seventy-two hours, the Standing Bail Order guarantees the arrestee release upon posting bail in the initial amount prescribed by the bail schedule.

Under the Standing Bail Order, indigent arrestees—those who cannot afford to post bail—receive similar treatment to arrestees for whom the Sheriff submits a bail request. After arrest, the Standing Bail Order guarantees them an initial appearance and bail hearing within seventy-two hours. At the initial appearance, a judge determines the terms of pretrial release. Before that initial appearance, the Standing Bail Order requires indigent arrestees to

complete two forms: an "Affidavit of Substantial Hardship," and a "Release Questionnaire." In the Release Questionnaire, the arrestee can provide information about his residence, employment, family situation, health, and criminal history for the purpose of ascertaining information that might be relevant to a pre-trial release. It also asks for the contact information of his nearest living relatives and of people in the community, who may vouch for his character. In the Hardship Affidavit, the arrestee can provide information about his employment, assistance benefits, income, expenses, and assets to have a public defender appointed.

At the indigent arrestee's initial appearance, the court sets the terms of the arrestee's pretrial release. The judge ensures that the defendant is aware of the charges against him and reviews his paperwork to determine whether he is indigent, as contemplated by the Alabama Rules of Criminal Procedure. *See* Ala. R. Crim. P. 7.2(a). The Standing Bail Order makes clear that the judge must impose the least onerous condition that will assure the purposes of bail are satisfied:

> The Court will not require a defendant to post a secured appearance bond that the defendant cannot afford to post, or a secured appearance bond in an amount less than that contained in the bond schedule that the defendant can afford to post, if there is a less onerous condition that would assure the defendant's appearance or minimize risk to the public.

The Standing Bail Order, however, does not guarantee an indigent arrestee release upon a showing of indigency. If the court

determines at the initial appearance that releasing the indigent defendant on his own recognizance or on an unsecured appearance bond will not satisfy the purposes of bail—i.e., will not guarantee his appearance at trial or safeguard the public—the court may require the posting of a secured appearance bond even if the indigent arrestee cannot afford it. If the court determines that a secured appearance bond is necessary, it must detail its findings in a written order. If the defendant wants to have his bail amount reconsidered, he may file a motion with the court.

This new system had only been in place for sixteen days when the district court held the preliminary injunction hearing. As a result, there was almost no evidence presented regarding how the system had been implemented. Nevertheless, the district court concluded that: (1) the Sheriff's Office was rarely making bail requests; (2) one individual was arrested on April 8, 2018, and was released on April 13, 2018, after posting a property bond; (3) judges were not fastidiously filling out their written findings of fact; and most importantly, (4) it was "not unusual for a judge to set bond for an indigent defendant in an amount the defendant cannot afford."

This lawsuit was first filed in February 2017—*before* the adoption of the Standing Bail Order—by a group of plaintiffs that are no longer a part of this case. Hester, the appellant here, did not move to intervene until August 1, 2017. He filed his intervenor complaint on March 9, 2018—about two weeks before the Standing Bail Order was adopted.

In his intervenor complaint, Hester alleges that he was arrested on August 27, 2017, for possession of drug paraphernalia. Because he could not afford to post the $1,000 bond required by the now-defunct bail schedule, he was held for two days before a magistrate judge could conduct an initial appearance. At that initial appearance, the magistrate judge explained to Hester the charge levied against him and how he could secure his pretrial release. But because he could not afford to post bond, Hester remained detained.

Hester sued six Defendants in his complaint: Matt Gentry—the Sheriff of Cullman County; Lisa McSwain—the Circuit Clerk of Cullman County; Joan White and Amy Black—magistrate judges; and Kim Chaney and Rusty Turner—district judges. He brought three 42 U.S.C. § 1983 claims: a wealth discrimination claim, a substantive due process claim, and a procedural due process claim. In essence, Hester alleged that the now-defunct bail system in Cullman County was unconstitutional because it guaranteed immediate pre-trial release to wealthy arrestees but imposed almost automatic detention orders on indigent arrestees.

On March 12, 2018, three days after filing his complaint, Hester moved for a preliminary injunction on his wealth-discrimination claim and his procedural due process claim. On March 26, 2018, as previously discussed, Cullman County instituted a new bail system as memorialized in the Standing Bail Order. Two days after that, Sheriff Gentry moved to dismiss Hester's complaint, in which he argued that he was not the proper party under § 1983 and

18-13894               Opinion of the Court                    13

*Ex parte Young*, 209 U.S. 123 (1908), because he was not responsible for the bail policies at issue and, as a result, Hester could not trace his injury to Sheriff Gentry's actions.

Sixteen days after the Standing Bail Order was implemented, the district court held a hearing on Hester's motion for a preliminary injunction. At some point between the filing of his complaint and the injunction hearing—although we do not know precisely on what date—Hester was released from jail. And five months later, on September 4, 2018, the district court issued its written order, concluding that Cullman County's new bail system unconstitutionally discriminated against the indigent by absolutely depriving them of immediate pretrial release and by denying them procedural due process at their bail hearings. The next day, the district court denied Sheriff Gentry's motion to dismiss.

On September 13, 2018, the district court entered a formal preliminary injunction order specifying the procedures that Cullman County would have to follow going forward in order to bring its bail system in compliance with the Constitution. Those procedures were detailed and expansive. The district court ordered the Sheriff's Office to immediately release all criminal defendants from pretrial confinement unless it was prepared to submit a bail request for that defendant. If the Sheriff's Office submitted such a request, then the Sheriff was obligated to inform the defendant—both orally and in writing—that a judge would have to find, by clear and convincing evidence at an initial appearance, that he was a "significant risk of flight or danger to the community." Despite the fact that

the County Defendants testified that they would be unable to hold initial appearances within forty-eight hours, the district court also ordered the Sheriff to immediately release all criminal defendants if they did not receive an initial appearance within that period. If the Sheriff submitted a bail request, the formal order also required the Sheriff to draft a new questionnaire to submit to criminal defendants that would elicit further information regarding flight risk and danger to the community. It also ordered the Sheriff to either provide criminal defendants with liaison deputies, who would assist criminal defendants in filling out this questionnaire, or inform the judge conducting the initial appearance that the defendant could not complete the questionnaire without assistance. And the formal order required the Sheriff to provide criminal defendants with an affidavit form in which the criminal defendants could provide information about their financial means. Importantly, the district court ordered nothing relating to the Judicial Defendants in this case—i.e., the other defendants named in Hester's complaint——each of the injunction's terms were directed only at the Sheriff's Office.

Sheriff Gentry immediately appealed the district court's orders denying his motion to dismiss and issuing the preliminary injunction. The remaining Judicial Defendants also filed a notice of appeal, directed only at the preliminary injunction orders. After initiating his appeal, however, Sheriff Gentry failed to file an appendix within the time required and, as a result, we dismissed his appeal for failure to prosecute, under this Court's Rule 42-1, on

January 7, 2019.  Following that dismissal, the appeal proceeded only as between Hester and the Judicial Defendants.  On January 30, 2019, however, Hester moved to dismiss the Judicial Defendants' appeal for lack of appellate jurisdiction, arguing that, because the injunction bound only the Sheriff, they had no interest in the appeal.  After that motion was filed, we reinstated Sheriff Gentry's appeal.  We then carried the motion to dismiss with the case.

All in all, we have three issues to address in this appeal: the district court's denial of Sheriff Gentry's motion to dismiss; the district court's issuance of a preliminary injunction; and Hester's motion to dismiss the Judicial Defendants from this appeal for lack of appellate jurisdiction.

## II.    STANDARDS OF REVIEW

We review a district court's order granting or denying a preliminary injunction for abuse of discretion.  *See Baker v. Buckeye Cellulose Corp.*, 856 F.2d 167, 169 (11th Cir. 1988).  But we review de novo a district court's determination of the facial constitutionality of a statute.  *See Rodriguez ex rel. Rodriguez v. United States*, 169 F.3d 1342, 1346 (11th Cir. 1999).

We review de novo a district court's order denying a state officer's motion to dismiss based on the Eleventh Amendment's grant of sovereign immunity.  *See Summit Med. Assocs., P.C. v. Pryor*, 180 F.3d 1326, 1334 (11th Cir. 1999); *Hundertmark v. State of Fla. Dep't of Transp.*, 205 F.3d 1272, 1274 (11th Cir. 2000).  Additionally, we have discretion to exercise our pendent appellate

jurisdiction over the denial of any motion to dismiss if it is "inextricably intertwined" with an appealable decision or if "review of the former decision [is] necessary to ensure meaningful review of the latter." *Swint v. Chambers Cnty. Comm'n*, 514 U.S. 35, 51 (1995); *accord Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1365 (11th Cir. 1997).

Finally, we determine our own appellate jurisdiction in the first instance. *Savannah Coll. of Art & Design, Inc. v. Sportswear, Inc.*, 978 F.3d 1347, 1348 (11th Cir. 2020) ("We have inherent jurisdiction to determine our own jurisdiction.").

## III.    ANALYSIS

Before reaching the merits of the appeal, we have some threshold issues to unpack.  The Defendants argued that the district court should abstain from hearing any part of this case under the abstention doctrine of *Younger v. Harris*, 401 U.S. 37, 43–44 (1971). Because a ruling for the Defendants on that issue would moot the rest of the discussion, we will begin there.  Next, we will turn to Sheriff Gentry's motion to dismiss—if we determine that we have jurisdiction over that motion on appeal, we will decide whether the district court was correct in denying the motion.  After discussing the Sheriff's motion to dismiss, we will move on to the Judicial Defendants' own arguments for dismissal—that they are entitled to absolute judicial immunity for their actions in setting bail.  And after disposing of all threshold issues, we will turn to the injunction itself.

### A. *Younger* Abstention

The district court was correct not to abstain from hearing this case under *Younger*. *Younger* abstention "restrain[s] courts of equity from interfering with criminal prosecutions." *Id.* at 44. The doctrine is "based not on jurisdiction, but on the principles of equity and comity," and it commands that "absent extraordinary circumstances federal courts should not enjoin pending state criminal prosecutions." *Hughes v. Att'y Gen. of Fla.*, 377 F.3d 1258, 1262–63 (11th Cir. 2004) (quoting *New Orleans Pub. Serv., Inc. v. Council of New Orleans*, 491 U.S. 350, 364 (1989)). Under *Younger*, the "normal thing to do when federal courts are asked to enjoin pending proceedings in state courts is not to issue such injunctions." 401 U.S. at 45.

*Younger* does not apply here because Hester is not asking us to enjoin any prosecution. He merely seeks a faster bail determination, which does not require enjoining or even interfering with any ongoing or imminent state prosecution. *See Walker v. City of Calhoun*, 901 F.3d 1245, 1254 (11th Cir. 2018) ("*Younger* does not readily apply here because Walker is not asking to enjoin any prosecution. Rather, he merely seeks prompt bail determinations for himself and his fellow class members."); *Pugh v. Rainwater*, 483 F.2d 778, 781–82 (5th Cir. 1973)[1] (noting that a federal question

---

[1] Opinions issued by the former Fifth Circuit prior to October 1, 1981, are binding precedent in our Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

whose "resolution . . . would [only] affect state procedures for handling criminal cases . . . is not 'against any pending or future court proceedings *as such*'" (quoting *Fuentes v. Shevin*, 407 U.S. 67, 71 n.3 (1972))), *aff'd in part and rev'd in part sub nom.*, *Gerstein v. Pugh*, 420 U.S. 103 (1975)).

*Gerstein* is instructive on this point.  In that case, a class of Florida detainees sought injunctive relief to receive faster probable cause determinations.  420 U.S. at 106–07.  The state argued that *Younger* should have barred the claim.  *See id.* at 108 n.9.  But the Supreme Court disagreed, making clear that *Younger* did not apply because "[t]he injunction was not directed at the state prosecutions as such, but only at the legality of pretrial detention without a judicial hearing, an issue that could not be raised in defense of the criminal prosecution."  *See id.*  The same is true here.  Because Hester could not have challenged in state court the issues he has raised in this federal action, *Younger* abstention is inappropriate.  Thus, the district court was correct to deny the Defendants' requests to abstain from hearing this case.

## B.  Sheriff Gentry's Motion to Dismiss

The district court was also correct to deny Sheriff Gentry's motion to dismiss.  Sheriff Gentry asked the district court to dismiss Hester's complaint against him under Federal Rules of Civil

Procedure 12(b)(1) and 12(b)(6). His motion raised three alternative grounds for dismissal: failure to state a claim, lack of standing, and sovereign immunity. The district court denied the Sheriff's motion in full.

Our precedent makes clear that the only portion of the order over which we have automatic jurisdiction is the ruling on sovereign immunity. "A district court's denial of a motion to dismiss on Eleventh Amendment immunity grounds is appealable immediately." *Summit Med.*, 180 F.3d at 1334.

That is not to say, however, that we may not review the entirety of the order. We may, "within our discretion, exercise jurisdiction over otherwise nonappealable orders under the pendent appellate jurisdiction doctrine." *Id.* at 1335. That doctrine allows a court of appeals to exercise jurisdiction over otherwise nonappealable orders if those orders are "inextricably intertwined" with an appealable decision or if "review of the [nonappealable] decision [is] necessary to ensure meaningful review of the [appealable decision]." *Swint*, 514 U.S. at 51.

We had occasion to expound on this rule in *Moniz v. City of Fort Lauderdale*, 145 F.3d 1278 (11th Cir. 1998). In *Moniz*, we considered whether the doctrine of pendent appellate jurisdiction allowed us to review a district court's decision on standing in tandem

with the district court's decision on qualified immunity.[2] *See id.* at 1281 n.3. We concluded that the standing issue was neither "inextricably intertwined" with nor "necessary to ensure meaningful review" of the immunity issue because we could "resolve the qualified immunity issue in [the] case without reaching the merits of appellants' challenge to Moniz's standing." *Id.* (quoting *Swint*, 514 U.S. at 50-51) ; *see also Summit Med.*, 180 F.3d at 1335 ("As in *Moniz*, we may resolve the Eleventh Amendment immunity issue here without reaching the merits of standing.").

In this case, unlike in *Moniz* and *Summit Medical*, Sheriff Gentry is entitled to immediate appellate review of both a denial of his sovereign immunity and the district court's issuance of a permanent injunction. The two remaining issues—the two that are not immediately appealable—are standing and failure to state a claim. But because a litigant requires both in order to obtain a preliminary injunction, we are permitted to exercise our pendent appellate jurisdiction to review the entirety of the district court's order denying Sheriff Gentry's motion to dismiss. Indeed, without standing or a viable legal claim, a litigant is not entitled to a preliminary injunction. Thus, exercising our pendent appellate jurisdiction to review the standing and pleading issues, over which we do

---

[2] A district court's denial of a motion to dismiss based on qualified immunity, like sovereign immunity, is immediately appealable. *See Summit Med.*, 180 F.3d at 1335 n.9.

18-13894                    Opinion of the Court                    21

not have automatic appellate jurisdiction, is "necessary to ensure meaningful review" of the preliminary injunction.

In the motion to dismiss, Sheriff Gentry—despite nominally raising three different bases for relief—rests his argument on essentially one point: that because he is not the individual responsible for writing Cullman County's bail policy or the individual bail order under the Standing Bail Order, he is not the proper defendant in this case. It is for this reason that Sheriff Gentry argues that he is entitled to sovereign immunity, that Hester fails to state a claim, and that Hester lacks standing. But no matter how the argument is framed, it fails.

First, Sheriff Gentry is not entitled to sovereign immunity. To be sure, the Eleventh Amendment's "fundamental principle of sovereign immunity limits the grant of judicial authority in Art[icle] III." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 98 (1984). "States may not be sued in federal court unless they consent to it in unequivocal terms or unless Congress, pursuant to a valid exercise of power, unequivocally expresses its intent to abrogate the immunity." *Green v. Mansour*, 474 U.S. 64, 68 (1985). In *Ex parte Young*, however, the Supreme Court created an exception to this general principle by holding that a suit challenging the constitutionality of a state official's action in enforcing state law is *not* a suit against the state. *See* 209 U.S. at 159–60. Instead, the law at issue, if found unconstitutional, is void, and therefore does not "impart to [the official] any immunity from responsibility to the supreme authority of the United States." *Id.* at 160. The Supreme

Court also made clear that the way to bring such a suit—the only way to avoid the shield of sovereign immunity—is to bring a suit for prospective injunctive relief against the official charged with enforcing the law. *See id.* at 155–56, 159. Because a state cannot authorize an official to do something that violates the Constitution, a state official who enforces an unconstitutional action is "stripped of his official or representative character and is subjected in his person to the consequences of his individual conduct." *Id.* at 160. Thus, a federal court has authority, under the Constitution, to grant "prospective injunctive relief to prevent a continuing violation of federal law." *Green*, 474 U.S. at 68.

Sovereign immunity, however—as well as the *Ex parte Young* exception to it—generally applies only to *state* officials, not *county* officials. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 280 (1977) (noting that the Eleventh Amendment does not apply to "counties and similar municipal corporations"). It extends to county officials only when relief against them would drain the state treasury or the county officials have been enlisted to carry out state policy. *See Lake Country Ests., Inc. v. Tahoe Reg'l Plan. Agency*, 440 U.S. 391, 401 (1979) (noting that the Eleventh Amendment may bar suit against county officials "in order to protect the state treasury from liability that would have had essentially the same practical consequences as a judgment against the State itself."). Sheriff Gentry, as the Sheriff of Cullman County, is not acting as a state official. Moreover, it is a *county* policy that we are reviewing, and the only relief sought is injunctive, not

monetary.  As a result, Sheriff Gentry is not entitled to Eleventh Amendment sovereign immunity in the first instance, and we need not reach the *Ex parte Young* analysis.

Admittedly, at least some portions of Hester's challenge to the bail scheme implicate state law—specifically, the factors to be considered at a bail hearing and the timing within which that hearing must occur.  But even if we were to conclude that Sheriff Gentry was thereby enlisted to carry out state policy, he still would not be entitled to sovereign immunity under *Ex parte Young*.  As our precedent makes clear:

> Personal action by defendants individually is not a necessary condition of injunctive relief against state officers in their official capacity.  All that is required is that the official be responsible for the challenged action.  As the *Young* court held, it is sufficient that the state officer sued must, "by virtue of his office, ha[ve] some connection" with the unconstitutional act or conduct complained of.

*Luckey v. Harris*, 860 F.2d 1012, 1015–16 (11th Cir. 1988) (alteration in original) (quoting *Ex parte Young*, 209 U.S. at 157).  And here it is the Sheriff who is tasked with the portions of the Standing Bail Order that are relevant to the injunction—specifically, the directive to continue detaining criminal defendants after forty-eight hours have passed and to provide defendants with certain forms while in custody.  He thus has "some connection" with the allegedly unconstitutional act.

24                    Opinion of the Court                    18-13894

Second, Hester has stated a plausible claim for relief against Sheriff Gentry, meaning that the district court rightfully rejected Sheriff Gentry's arguments about plausibility and standing because Sheriff Gentry was properly named as a defendant. In arguing for dismissal on this ground, Sheriff Gentry relies on *ODonnell v. Harris County*, 892 F.3d 147, 163 (5th Cir. 2018), *abrogated by Daves v. Dallas County*, 22 F.4th 522(5th Cir. 2022) (en banc), for support. In that case, the Fifth Circuit concluded that the Sheriff was not the proper defendant in a § 1983 action challenging unconstitutional bail procedures, and that the suit was appropriately brought only against the county judges. *See* 892 F.3d at 155–56.

The problem with Sheriff Gentry's reliance on *ODonnell*[3] is twofold. First, *ODonnell* was concerned with whether the Sheriff was a "policymaker" under § 1983 such that municipal liability could attach to his actions. *See id.* at 156. This case, however, does not seek to impose municipal liability under § 1983. In this respect, this case is more similar to *Pugh v. Rainwater*, 483 F.2d 778 (5th

---

[3] Following oral argument in this appeal, the *en banc* Fifth Circuit in *Daves* abrogated its decision in *ODonnell*. The *en banc* court, however, did not reach the standing issue as to whether the Sheriff of Dallas County was the proper party, leaving that issue to be considered by the *en banc* court following its limited remand on the *Younger* abstention issue. *See Daves*, 22 F.4th at 545.

Cir. 1973),[4] in which this Court allowed a constitutional challenge to bail to proceed against eight judges and other state officials including the State Attorney.

Second, the question of whether a state official has been given sufficient authority to be sued under § 1983 is "a question of state law." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). *ODonnell* dealt with a Sheriff's authority under Texas law, while this case concerns Alabama law. In Texas, as the *ODonnell* Court itself noted, the Sheriff "is legally obliged to execute all lawful process and cannot release prisoners committed to jail by a magistrate's warrant." 892 F.3d at 156 (citing Tex. Code Crim. Pro. arts. 2.13, 2.16, 2.18, and Tex. Loc. Gov't Code § 351.041(a)). In Alabama, on the other hand, Cullman County's Standing Bail Order requires the Sheriff to release criminal defendants—regardless of how they were arrested—after a specific time period has passed. *See* Standing Bail Order at 8 ("In the unlikely event that a defendant arrested for a bailable offense cannot obtain release by posting the bond contained in the bond schedule or set in a warrant and cannot be given a hearing to determine conditions of release within 72 hours after arrest, such a defendant *will be released* on an appearance bond in the amount of the minimum bond set in Rule 7.2 at the expiration of the 72-hour period." (emphasis added)).

---

[4] Opinions issued by the former Fifth Circuit prior to October 1, 1981, are binding precedent in our Circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

Additionally, in *Luckey v. Harris*, 860 F.2d 1012 (11th Cir. 1988), a group of indigent plaintiffs sought to challenge the lack of effective legal representation in Georgia's state courts. *See id.* at 1013. We allowed the suit to proceed against both the Governor of Georgia and a group of judges in the state— even though none of those defendants "personally" participated in the deprivation of counsel—because each of the defendants had at least "some connection" to the public-defender scheme at issue. *See id.* at 1015– 16.

Here, as in *Luckey*, it is immaterial that Sheriff Gentry is not personally responsible for drafting the policy at issue. Because he has the authority, under Cullman County's currently operative bail procedures, to release criminal defendants from jail after a specified amount of time has passed, he has a sufficient connection with the policy for suit to be brought against him. Thus, the district court was right to deny Sheriff Gentry's motion to dismiss. Regardless of whether Sheriff Gentry is a state official (in which case *Ex parte Young* would allow suit) or whether he is a county official (in which case sovereign immunity does not apply), the Eleventh Amendment does not shield the Sheriff from litigation. And Hester has stated a viable § 1983 claim for violation of his rights under the equal protection and due process clauses. Hester has standing for these claims because his injury—not being promptly released from jail—is traceable to the Sheriff's decision not to promptly release him from jail. Given this level of authority, we have no trouble concluding that Sheriff Gentry is the appropriate defendant here,

and we therefore conclude that his arguments for dismissal fail. We thus affirm the district court's denial of the Sheriff's motion to dismiss.

### C.  Hester's Motion to Dismiss the Judicial Defendants from this Appeal

Finally, we reach the only motion filed directly in this Court: Hester's motion to dismiss the Judicial Defendants from this appeal for lack of appellate jurisdiction.  Hester's argument for dismissal—that the Judicial Defendants may not appeal the entry of an injunction because the injunction binds only the Sheriff—is in large part based on an argument that the Judicial Defendants themselves raised in the first instance.  In response to Hester's motion for a preliminary injunction, and again in this Court, the Judicial Defendants argued that, as sitting judges, they are entitled to judicial immunity for their actions.  And because, according to them, at least, the injunction has the practical effect of binding their actions and is enforceable against them through contempt, they argue that this Court has appellate jurisdiction over their appeal and should reverse the injunction based on their judicial immunity.

Hester raises the inverse of this argument in his motion to dismiss before this Court.  Here, he argues that the Judicial Defendants may not even appeal the injunction because no part of the injunction is directed at them, and, as such, this Court lacks appellate jurisdiction under 28 U.S.C. § 1292(a)(1).

For an order to be appealable under § 1292(a)(1), it must be a clear and understandable directive from the district court, it must be enforceable through contempt proceedings if the directive is disobeyed, and it must give some or all of the substantive relief sought in the complaint. *See Alabama v. U.S. Army Corps of Eng'rs,* 424 F.3d 1117, 1128 (11th Cir. 2005); *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1358 (11th Cir. 2008). But to appeal an order granting or dissolving a preliminary injunction, "[l]itigants must establish their standing not only to bring claims, but also to appeal judgments." *Wolff v. Cash 4 Titles,* 351 F.3d 1348, 1353 (11th Cir. 2003). A litigant may appeal only if he is aggrieved by the decision. *Id.* at 1354. Thus, parties may lack standing to appeal trial court rulings that do not affect their interests. *Id.*

The Judicial Defendants, in an attempt to establish their standing to bring this appeal, make three arguments in support of appellate jurisdiction. They say that: (1) the injunction has the "practical effect" of enjoining them; (2) even if the injunction does not directly bind them, it is still enforceable against them through contempt; and (3) even if the first two arguments fail, this Court may exercise "pendent party appellate jurisdiction" to hear their appeal.

Each of these arguments lacks merit. There is little question here that the injunction, by its very terms, does not require the Judicial Defendants to do anything, and that the injunction could not be enforceable against the Judicial Defendants through contempt.

Moreover, this Court does not exercise pendent party appellate jurisdiction.

The Judicial Defendants first argue that the injunction, despite binding only the Sheriff, has the "practical effect" of enjoining them as well. They cite *Sierra Club* as support for this argument. But in that case, we were concerned with an altogether different question: whether an order that we unquestionably had appellate jurisdiction over was only a merits ruling or was also an injunction. *See* 526 F.3d at 1358–59 ("Sierra Club points to the district court's express declaration that it was not issuing an injunction, but we conclude this is an instance where substance should control over form. The district court issued commands of such specificity and breadth that no litigant would dare violate them. If the Miners had violated the commands, the district court could have initiated contempt proceedings, and it is not clear to us that the court would accept 'But you said it wasn't an injunction' as a defense." (citation omitted)). *Sierra Club* said nothing about the issue raised here: whether an injunction directed at one defendant is appealable by some other defendant.

And we also note that the injunction does not have the effect—practically or otherwise—of binding their actions. Nothing in the injunction prevents the Judicial Defendants from taking any action they wish. It orders the *Sheriff* to provide notice to arrestees, prevents the *Sheriff* from continuing to hold arrestees after forty-eight hours, and orders the *Sheriff* to deliver forms to the Clerk of Court. No part of this injunction requires anything of the

Judicial Defendants.  If they wish to continue scheduling bail hearings more than forty-eight hours after arrest, they may continue to do so.  If they wish to ignore the information that the Sheriff provides them, they may do that as well.  No part of the injunction requires them to modify their actions in any way.

For this same reason, the Judicial Defendants' argument that the injunction is enforceable against them through contempt—as required for appellate jurisdiction—fails.  It is true that a district court may hold in contempt any entity who acts in concert with an enjoined party to assist in violating the injunction.  *See* Fed. R. Civ. P. 65.  But even if the Judicial Defendants *order* the Sheriff to disobey the federal court's injunction, or jail him for failing to do so, they would not themselves be participating in the violation of the injunction.

Under the Supremacy Clause, the federal Constitution is the "supreme Law of the Land."  U.S. Const. art. VI, cl. 2.  If faced between the decision to obey federal law, as memorialized in the injunction, and state law, as memorialized in whatever order the Judicial Defendants issue, the choice is easy: the Sheriff must follow the injunction.  As such, if and when the Sheriff chooses to obey state law over federal law, it will be his—and only his—violation of the injunction.  The Judicial Defendants cite no case to the contrary.  And our conclusion that the district court may not use its contempt power over the Judicial Defendants is bolstered by the fact that this is not a question we answer on a blank slate: the district court has already made clear, in a written order, that it will not

use its contempt power against the Judicial Defendants if they choose to continue their current bail-setting practices. Specifically, the district court in its written order concluded that "[b]ecause the preliminary injunction does not direct the conduct of the judicial defendants in any manner and because this [c]ourt has no contempt power over the judicial defendants under the injunction, the judicial defendants are unlikely to succeed in their procedural effort to present their substantive arguments." Thus, under the law-of-the-case doctrine, the issue has been decided. *See This That & the Other Gift & Tobacco, Inc. v. Cobb County*, 439 F.3d 1275, 1283 (11th Cir. 2006) (noting that "the law-of-the-case doctrine bars re-litigation of issues that were decided either explicitly or by necessary implication").

Finally, the Judicial Defendants' attempt to have their case heard based on the doctrine of pendent party appellate jurisdiction is a nonstarter as this Court does not recognize that doctrine. *See Swint v. City of Wadley*, 51 F.3d 988, 1002 (11th Cir. 1995) ("There is no pendent party appellate jurisdiction."); *see also Haney v. City of Cumming*, 69 F.3d 1098, 1102 (11th Cir. 1995).

In short, because the injunction at issue on appeal: (1) does not bind the Judicial Defendants on its face or in practice; (2) is not enforceable against the Judicial Defendants through contempt; and (3) because no other basis exists to exercise jurisdiction, the Judicial Defendants' appeal must be dismissed. And because they will be excused from this lawsuit, we will not reach their arguments

related to judicial immunity.  Those questions may be answered only when properly presented.

## D.  The Preliminary Injunction

Having concluded that Sheriff Gentry is the appropriate Appellant and that the district court was right not to abstain from hearing the case under *Younger*, we now turn to the merits of the appeal—the injunction.

In its written order, the district court found that Cullman County's bail system violated both the Equal Protection and Due Process Clauses of the Fourteenth Amendment.  The district court concluded that the bail system impermissibly discriminated against the indigent by absolutely depriving them of pretrial release and by denying them procedural due process at their bail hearings.

Our first task is to properly construe the nature of Hester's challenge to the bail system.  At oral argument, the parties disputed whether Hester was bringing a facial challenge to the bail system or an as-applied challenge to the bail system, especially as the district court never made clear in its order whether it was construing the challenge as a facial or an as-applied factual challenge.  It is clear, however, that Hester was neither arrested nor imprisoned under Cullman County's current operative bail system.  And by the time of the hearing on the preliminary injunction, Hester had been released.  As such, Hester cannot trace his injury to the current operative bail system, and thus may not challenge it on an as-applied basis. *Cf. Pugh v. Rainwater*, 572 F.2d 1053, 1058–59 (5th Cir. 1978)

(en banc) (reconstruing as-applied challenge to Florida bail rules as facial challenge because Florida had changed the applicable rules during pendency of litigation); *Walker*, 901 F.3d at 1267 n.13 (determining only whether the City of Calhoun's bail scheme is facially unconstitutional because the bail scheme was amended during pendency of litigation).

Moreover, the bail system at issue had only been in place for *sixteen days* before the district court held its preliminary injunction hearing. Indeed, as the district court found in its order: "at the hearing on Mr. Hester's motion, the defendants were able to offer little evidence concerning the implementation of the new policy." And because a factual, as-applied challenge "asserts that a statute cannot be constitutionally applied in particular circumstances, it necessarily requires the development of a factual record for the court to consider." *Harris v. Mexican Specialty Foods, Inc.*, 564 F.3d 1301, 1308 (11th Cir. 2009). This is because an as-applied challenge "addresses whether 'a statute is unconstitutional on the facts of a particular case or to a particular party.'" *Id.* (quoting *Black's Law Dictionary* 223 (7th ed. 1999)).

In this case, both the party—Hester—and the facts of his case are tied to the now-defunct bail scheme in Cullman County, as the new scheme had been in place only for a very short while before the district court ruled on its constitutionality. Construing Hester's challenge as an as-applied challenge to the new bail scheme, given the record before us, would violate core justiciability principles. Hester's lawsuit will succeed only if Cullman

County's new scheme is facially unconstitutional—i.e., if Hester can "establish that no set of circumstances exists under which the [bail scheme] would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987).

Our dissenting colleague, however, suggests that, based on our determination that Hester cannot trace his injury to the current operative bail system, as he was detained under the pre-Standing Bail Order bail policies that are no longer in effect, we should conclude that Hester lacks standing to raise a challenge against the Standing Bail Order. *See* Dis. Op. at 9–12. But based on our binding precedent in the nearly indistinguishable *Rainwater* and *Walker* cases, we conclude that, as to Hester's facial challenge to the Standing Bail Order, we have jurisdiction because Hester's challenge is not moot.

It is well-established that, to establish standing, a plaintiff must have: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Johnson v. 27th Ave. Caraf, Inc.*, 9 F.4th 1300, 1311 (11th Cir. 2021) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)). We have long held that standing is determined as of the time at which the plaintiff's complaint is filed. *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1340 (11th Cir. 2014); *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1275 (11th Cir. 2003); *Sims v. Fla., Dep't of Highway Safety & Motor Vehicles*, 862 F.2d 1449, 1458–59 (11th Cir. 1989). Where a plaintiff establishes standing at the time he filed his

18-13894                Opinion of the Court                35

complaint but "[w]hen events subsequent to the commencement of a lawsuit create a situation in which the court can no longer give the plaintiff meaningful relief," the question becomes whether the case is moot. *Fla. Ass'n of Rehab. Facilities, Inc. v. Fla. Dep't of Health & Rehab. Servs.,* 225 F.3d 1208, 1217 (11th Cir. 2000); *see also Coral Springs Street Sys., Inc. v. City of Sunrise,* 371 F.3d 1320, 1328 (11th Cir. 2004) ("Mootness can occur due to a change in circumstances, or . . . a change in the law.").

When Hester moved to intervene and filed a proposed intervenor complaint in the underlying action, Hester alleged that he had suffered an injury in fact, i.e., his detention on a bond that he could not pay due to his indigent status, which he claimed was essentially an automatic detention order. This injury was fairly traceable to the challenged conduct of the Defendants and would have likely been redressed by a favorable judicial decision—a court ruling that Cullman County's former bail policies were unconstitutional and injunctive relief against those policies. Thus, Hester had standing at the time he filed his intervenor motion and proposed intervenor complaint.

The question then becomes whether the Standing Bail Order issued by the presiding circuit judge of Cullman County on March 26, 2018—issued after Hester was granted leave to intervene in the case and while the case was still pending in the district court—renders Hester's challenge moot or prevents him from raising any challenge to the new Standing Bail Order policies. Under our binding precedent in *Rainwater* and *Walker*, we conclude that

the case is not moot and that we have jurisdiction to hear Hester's facial challenge to the Standing Bail Order.

For example, in *Rainwater*, during the pendency of the litigation, Florida adopted a new rule of criminal procedure governing bail determinations within the state. *See* 572 F.2d at 1055, 1058. Sitting *en banc*, the former Fifth Circuit noted that, given the new rule, the record before it "reflect[ed] neither [the rule's] interpretation nor application by the courts of Florida," as it contained "only evidence of practices under criminal procedures which predate the adoption of the current Florida rule." *Id.* at 1058. Although the court determined that "[a]s an attack on the Florida procedures which existed as of the time of trial, the case has lost its character as a present, live controversy and is therefore moot," it nonetheless concluded that Florida's new rule, "on its face," did "not suffer such infirmity that its constitutional application is precluded." *Id.* The former Fifth Circuit further emphasized this conclusion: "We hold that the new Florida rule is not facially unconstitutional." *Id.* at 1059. But, as to any as-applied challenges, the court explained that "[f]urther adjudication . . . should await presentation of a proper record reflecting application by" Florida courts. *See id.* at 1058–59.

This case is virtually identical to *Rainwater*. As in *Rainwater,* there has been almost no evidence presented as to the Standing Bail Order, and Hester was not detained under the new bail procedures. And, as in *Rainwater,* as a result of the Standing Bail Order, Hester's challenge to Cullman County's former bail procedures is now moot. Yet the *en banc* former Fifth Circuit ruled on the facial

challenge to the new Florida bail procedures; we likewise reach Hester's facial challenge to the Standing Bail Order.

Moreover, while our predecessor court did not expressly discuss standing, its decision in *Rainwater* expressly discussed mootness, which is closely related to the standing doctrine. *See Sims,* 862 F.2d at 1459 (citing *Warth v. Seldin*, 422 U.S. 490, 499 n.10 (1975)) ("Mootness and standing are related doctrines. Where a party challenges standing, the court inquires whether the plaintiff is entitled to relief. Where mootness is at issue, the court determines whether judicial activity remains necessary."). And given its mootness discussion, we disagree with our dissenting colleague that the former Fifth Circuit did not conclude it had jurisdiction to address the facial challenge to the new bail procedures issued during the pendency of that litigation. Thus, under *Rainwater*, Hester has standing to challenge the Standing Bail Order.

Similarly, in *Walker*, the plaintiff was arrested and detained, but could not post bail. 901 F.3d at 1251. While still detained, the plaintiff sued the city, alleging that the city's bail procedures were unconstitutional. *See id.* at 1251–52. The day after filing suit, the plaintiff was released, and while the plaintiff's case was pending, the city altered the bail policies by issuing a standing bail order. *Id.* at 1252. On appeal, we concluded that the district court abused its discretion in enjoining the standing bail order, reaching the merits of the plaintiff's claim even though he was detained under the city's former bail procedures. *Id.* at 1269, 1272; *accord id.* at 1267 n.13 (stating that the standing bail order facially passed constitutional

muster).  In so doing, we addressed the city's argument that the standing bail order, if constitutional, rendered the plaintiff's claim moot.  *See id.* at 1269–71.  Specifically, the city contended that "because a new policy has been promulgated after this litigation began, which supplanted the original policy, the claim against the original policy is now moot."  *Id.* at 1269.

We found the city's argument without merit.  We explained that "[v]oluntary cessation of allegedly illegal conduct does not deprive the tribunal of power to hear and determine the case, i.e., does not make the case moot."  *Id.* at 1270 (quoting *Flanigan's Enters., Inc. of Ga. v. City of Sandy Springs*, 868 F.3d 1248, 1255 (11th Cir. 2017) (en banc)), *abrogated on other grounds by Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021)).  Rather, the case was moot only if this Court had "no reasonable expectation that the challenged practice will resume after the lawsuit is dismissed."  *Id.* (quoting *Flanigan's*, 868 F.3d at 1255–56).  We considered three factors to determine whether a reasonable expectation existed: (1) "whether the change in conduct resulted from substantial deliberation or is merely an attempt to manipulate our jurisdiction," i.e., by examining "the timing of the repeal, the procedures used in enacting it, and any explanations independent of this litigation which may have motivated it"; (2) "whether the government's decision to terminate the challenged conduct was 'unambiguous,'" i.e., "whether the actions that have been taken to allegedly moot the case reflect a rejection of the challenged conduct that is both permanent and complete"; and (3) "whether the government has

consistently maintained its commitment to the new policy or leg-islative scheme." *Id.* (quoting *Flanigan's*, 868 F.3d at 1257). Based on our analysis of these factors, we concluded the case was not moot. As to the first factor, we doubted the city intended to ma-nipulate jurisdiction (as opposed to correcting a deficient policy) but explained that the city was unnecessarily secretive, as it failed to disclose the process to create the standing bail order. *Id.* at 1271. As for the second factor, we explained the city had not changed its bail policy through a legislative act; instead, a single judge had is-sued the new bail policy "and, while it is perhaps unlikely, we [could not] say that this judge might not revert to the original pol-icy." *Id.* And as to the third factor, we concluded that it did "not cut strongly either way" because the implementation of the policy was enjoined shortly after its creation by the district court. *Id.*

As in *Rainwater*, in *Walker* this Court addressed the facial constitutionality of the city's new bail policy instead of determining that the plaintiff lacked standing. And, as to the "reasonable expec-tation" factors for mootness, this case has key factual similarities to the facts in *Walker*. For example, the second factor weighs against a finding of mootness, as the Standing Bail Order was issued by a single judge in Cullman County, not a legislative body. Addition-ally, as to the first factor, while the "unnecessarily secretive" con-cerns as to the creation of the new bail policy present in *Walker*, *see id.*, are not present, other concerns weigh in favor of a finding against mootness, i.e., the Standing Bail Order's issuance after Hes-ter intervened in the case and while the case was pending in the

40                    Opinion of the Court                    18-13894

district court.  Accordingly, *Walker* likewise supports our determination that we have jurisdiction to consider Hester's challenge to the Standing Bail Order.[5]

Concluding we have jurisdiction, we now turn to address Hester's wealth-discrimination claim.

---

[5] We also disagree with our dissenting colleague's assertion that we are "throw[ing] out" the facts we rely on to establish jurisdiction in analyzing Hester's claim. Dis. Op. at 12.  Our determinations on this issue are simply based on the undisputed background below—i.e., Hester was detained under the pre-Standing Bail Order, and the Standing Bail Order was issued after Hester was released and while he was litigating in the district court below—and how that background places this case jurisdictionally under the purview of *Rainwater* and *Walker*.  We also conclude that the fact that the district courts in *Rainwater* and *Walker* did not make factual findings on the new bail procedures, which is unlike the case before us (*see* Dis. Op. at 12–16), to be a distinction that does not make a difference in our conclusion that we are limited to considering only Hester's *facial* challenge to the Standing Bail Order and that we have jurisdiction to consider that challenge.  The dissent's attempt to distinguish our precedents in *Rainwater* and *Walker* on that basis is a weak read on which to rely given the district court's minimal findings of fact concerning the Standing Bail Order.  *See* Docket 159 at 19 (the district court acknowledged that "the defendants were able to offer little evidence concerning implementation of the new policy, but the limited evidence that the defendants did offer indicates that officials in Cullman County do not always comply with the written requirements in the new Standing Order").

### 1. *Equal Protection*

The Constitution makes clear that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. But this promise of equal protection "must coexist with the practical necessity that most legislation classifies for one purpose or another, with resulting disadvantage to various groups or persons." *Romer v. Evans*, 517 U.S. 620, 631 (1996). Accordingly, we, as a general matter, examine laws only to determine whether they bear a rational basis to a legitimate government interest. *See, e.g.*, *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 491 (1955). Heightened scrutiny, on the other hand, is reserved for state laws that burden fundamental rights or draw lines between suspect classes. As the Supreme Court has directed, we must, in the equal protection context

> decide, first, whether [the law] operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution, thereby requiring strict judicial scrutiny. . . . If [it does] not, the [law] must still be examined to determine whether it rationally furthers some legitimate, articulated state purpose and therefore does not constitute an invidious discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment.

*San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 17 (1973).

The Supreme Court has unambiguously held that discrimination against the indigent, without more, does not implicate a

suspect classification—and thus does not trigger strict scrutiny. *See, e.g.*, *Maher v. Roe*, 432 U.S. 464, 471 (1977) ("In a sense, every denial of welfare to an indigent creates a wealth classification as compared to nonindigents who are able to pay for the desired goods or services. But this Court has never held that financial need alone identifies a suspect class for purposes of equal protection analysis."); *Rodriguez*, 411 U.S. at 29 (noting that "this Court has never heretofore held that wealth discrimination alone provides an adequate basis for invoking strict scrutiny").

The Supreme Court, however, has signaled that heightened scrutiny for claims of wealth discrimination may be appropriate in certain contexts. And two of those contexts have been in setting the terms of carceral punishment and ensuring access to judicial proceedings. *See Jones v. Governor of Florida*, 975 F.3d 1016, 1030 (11th Cir. 2020) (*en banc*) (citing *Bearden v. Georgia*, 461 U.S. 660 (1983), and *Griffin v. Illinois*, 351 U.S. 12 (1956)). That such contexts are implicated in a case, however, does not immediately require the application of heightened scrutiny. In *Rodriguez*, the Supreme Court explained that, in the historical cases in which heightened scrutiny applied to claims of wealth discrimination, the

> individuals, or groups of individuals, who constituted the class discriminated against . . . shared two distinguishing characteristics: because of their impecunity they were *completely unable to pay* for some desired benefit, and as a consequence, they sustained an *absolute deprivation* of a meaningful opportunity to enjoy that benefit.

411 U.S. at 20 (emphasis added). In *Walker*, we similarly noted that

> [t]he *sine qua non* of a *Bearden-* or *Rainwater-*style claim . . . is that the State is treating the indigent and the non-indigent categorically differently. Only someone who can show that the indigent are being treated systematically worse "solely because of [their] lack of financial resources"—and not for some legitimate State interest—will be able to make out such a claim.

901 F.3d at 1260 (alteration in original) (quoting *Bearden*, 461 U.S. at 661). For heightened scrutiny to apply to a claim of wealth discrimination, then, not only must the claim arise in certain well-defined contexts that the Supreme Court has identified, but the indigent must suffer an absolute deprivation of a government benefit in that context due solely to their inability to pay for it. *See, e.g.*, *Jones*, 975 F.3d at 1055 (Lagoa, J., concurring).

The question we must answer to resolve this appeal is thus whether Cullman County's bail scheme absolutely deprives indigent arrestees of pretrial release solely because of their inability to pay. We begin this analysis by noting that the right to pretrial release is not absolute. Rather, it is "conditioned upon the accused's giving adequate assurance that he will stand trial and submit to sentence if found guilty." *Rainwater*, 572 F.2d at 1057 (quoting *Stack v. Boyle*, 342 U.S. 1, 4 (1951)). Indeed, states have "a compelling interest in assuring the presence at trial of persons charged with crime." *Id.* at 1056. At the same time, however, the accused individuals "remain clothed with a presumption of innocence and with

their constitutional guarantees intact." *Id.* For this reason, the res-
olution of "the problems concerning pretrial bail requires a delicate
balancing of the vital interests of the state with those of the individ-
ual." *Id.*

No one disputes that Cullman County maintains a compel-
ling interest in ensuring that pretrial detainees appear for trial and
do not pose a risk of danger to their community while on release.
*See* Ala. R. Crim P. 7.2. And Hester does not allege that his bail
amount—or that any bail amount in Cullman County—is higher
than necessary to satisfy those two purposes of bail. For good rea-
son: that would be an Eighth Amendment claim under the Exces-
sive Bail clause, and analysis under the Eighth Amendment pro-
ceeds without reference to ability to pay. *See United States v.
James*, 674 F.2d 886, 891 (11th Cir. 1982) ("The basic test for exces-
sive bail is whether the amount is higher than reasonably necessary
to assure the accused's presence at trial."). Indeed, "we have im-
plicitly held that bail is not excessive under the Eighth Amendment
merely because it is unaffordable." *Walker*, 901 F.3d at 1258.

Here, we conclude that indigent pretrial detainees in Cull-
man County are not discriminated against solely based on their in-
ability to pay, and neither do they suffer an absolute deprivation of
a meaningful opportunity to obtain pretrial release. On this point,
we reiterate that bail serves an important purpose. By the posting
of bail, the accused has made a showing—a financial sacrifice—that
he will appear for his trial. Thus, the indigent and the non-indigent
arrestees are not on equal footing—only the latter has made a

showing that he will appear for his trial, and he has made that showing by satisfying the terms of Cullman County's master bail schedule. *See Rainwater*, 572 F.2d at 1057 (approving of the "[u]tilization of a master bond schedule"). In this way, pretrial detainees who do not secure immediate release are not being discriminated against due to inability to pay—they are being discriminated against for failure to ensure in the first instance their future appearance at trial.

Although an indigent arrestee cannot secure his immediate release by satisfying the terms of the master bond schedule, the Standing Bail Order guarantees indigent arrestees an initial appearance and bail hearing before a circuit judge. At the bail hearing, the judge is tasked with assessing the accused's indigency, flight risk, and likelihood of appearing at trial. *See* Ala. R. Crim. P. 7.2(a). The Standing Bail Order makes clear, however, that the judge must impose the least onerous condition that will assure the purposes of bail are satisfied:

> The Court will not require a defendant to post a secured appearance bond that the defendant cannot afford to post, or a secured appearance bond in an amount less than that contained in the bond schedule that the defendant can afford to post, if there is a less onerous condition that would assure the defendant's appearance or minimize risk to the public.

The Standing Bail Order thus adopts a presumption *against* money bail, that an indigent arrestee cannot afford, at individualized bail hearings. At the hearing, the judge may impose a secured

appearance bond on the accused *only* if the judge determines that there is no less onerous method of ensuring the accused's appearance at trial. This is not discrimination against the indigent. All arrestees are presumptively entitled to pretrial release as soon as they make a showing that they will appear at trial—either by posting bail or by appearing at a hearing and attempting to show through other means that they will appear at trial.

Our caselaw amply supports the conclusion that Cullman County's bail system does not unconstitutionally discriminate against the indigent. Indeed, this Court has already applied the *Bearden* wealth-discrimination framework to the bail context on two separate occasions. In *Rainwater*, this Court was tasked with deciding whether "in the case of indigents, equal protection standards require a presumption against money bail." 572 F.2d at 1056. And in *Walker*, this Court analyzed "what process the Constitution requires in setting bail for indigent arrestees." 901 F.3d at 1251. In both cases, this Court upheld the constitutionality of money bail against constitutional challenges.

In an earlier *Pugh v. Rainwater* decision, our predecessor court decided the narrow issue of "whether the imprisonment of an indigent prior to trial solely because he cannot afford to pay money bail violates his right to equal protection under the Fourteenth Amendment." *See* 557 F.2d 1189, 1192 (5th Cir. 1977), *vacated in part on reh'g en banc*, 572 F.2d 1053 (5th Cir. 1978) (en banc). The plaintiffs, a class of pretrial detainees, sued a group of judges and state officials to enjoin the pretrial detention of arrestees

18-13894                Opinion of the Court                    47

without a determination of probable cause and the pretrial detention of indigent arrestees solely because they could not post money bail. *Id.* at 1193. This Court, rehearing the case en banc, acknowledged the "principle that imprisonment solely because of indigent status is invidious discrimination and not constitutionally permissible." 572 F.2d at 1056. At the same time, however, the Court noted the delicate balance of the competing interests at play: "Florida has a compelling interest in assuring the presence at trial of persons charged with crime. Yet such individuals remain clothed with a presumption of innocence and with their constitutional guarantees intact." *Id.* (footnote omitted).

During the *Rainwater* litigation, Florida passed a new Rule of Criminal Procedure that governed bail determinations in the state: Rule 3.130(b)(4). *See id.* at 1055; *see also In re Fla. Rules of Crim. Proc.*, 272 So. 2d 65, 82 (Fla. 1972), *amended sub nom.*, *In re Fla. Rules of Crim. Proc., Amends. to Rules 3.140 & 3.170*, 272 So. 2d 513 (Fla. 1973) (adopting new rules of criminal procedure, including Rule 3.130(b)(4), "Hearing at First Appearance"). Under that new rule, Florida mandated that judges consider "all relevant factors" in determining "what form of release is necessary to assure the defendant's appearance." *Id.* at 1058 (quoting Rule 3.130(b)(4)). And this Court interpreted the Rule to require the judge to impose the least onerous condition that would assure the defendant's appearance at trial. *Id.* at 1058 n.8.

This Court said that the record "contain[ed] only evidence of practices under criminal procedures which predate the adoption

of the current Florida rule." *Id.* Thus, it determined that "[a]s an attack on the Florida procedures which existed as of the time of trial, the case ha[d] lost its character as a present, live controversy and [was] therefore moot." *Id.* The *en banc* Court proceeded—as we do here—to assess only whether the new scheme was constitutional on its face. *See id.* at 1058–59. As relevant here, the Court said that "[t]he demands of equal protection of the laws and of due process prohibit depriving pre-trial detainees of the rights of other citizens to a greater extent than necessary to assure appearance at trial and security of the jail." *Id.* at 1057 (quoting *Rhem v. Malcolm*, 507 F.2d 333, 336 (2d Cir. 1974)). Therefore, "[t]he incarceration of those who cannot" meet a master bond schedule's requirements, "without meaningful consideration of other possible alternatives, [would infringe] on both due process and equal protection requirements." *Id.* Ultimately, the *Rainwater en banc* Court found that Florida's bail system met this test. In Florida, indigent arrestees who could not afford to post bail were given a bail hearing at which all relevant factors for bail would be considered and the judge was required to impose the least onerous condition on release that would satisfy the purposes of bail. That system, the Court said, passed constitutional muster. *See id.*

In *Walker*, the plaintiff, alleged that the City of Calhoun, Georgia, followed a policy of using a secured-money bail schedule that, in some cases, would jail people before trial for inordinate amounts of time. 901 F.3d at 1252. Because Walker was arrested

on the Monday before Labor Day, for example, he waited eleven days before receiving his bail hearing. *Id.*

Shortly after the lawsuit was filed, the City of Calhoun altered the prevailing bail policy by issuing a new standing bail order that adopted a bail schedule and guaranteed that defendants would be brought to court within forty-eight hours of arrest. *Id.* The new standing order also guaranteed indigent arrestees a public defender at the bail hearing and adopted a standard of indigency that was commensurate with the federal poverty guidelines. *Id.* If the arrestee was found indigent at the bail hearing, he would be released without paying any bail and, if no hearing was held within forty-eight hours, he would be released on a recognizance bond. *Id.* "In summary," this Court noted that

> the Standing Bail Order envisions three forms of release depending on the type of offense charged and the financial means of the arrestee. *First*, arrestees charged with State offenses within the Municipal Court's jurisdiction will be released immediately on a secured bond if they are able and willing to deposit money bail in the amount set by the bail schedule. They can post cash bail themselves or use a commercial surety at twice the amount set by the bail schedule. *Second*, arrestees charged with State offenses who do not post bail immediately must wait for a bail hearing with court-appointed counsel, to take place within 48 hours from arrest. Those who can prove they are indigent at the hearing will be released on a recognizance bond—meaning no bail amount is set,

either secured or unsecured. *Third*, all arrestees charged with violating City ordinances will be released on unsecured bond, meaning that they need deposit no collateral immediately but will be assessed the bail schedule amount if they fail subsequently to appear in court.

*Id.* at 1252–53.

The *Walker* Court next turned to the appropriate level of scrutiny, summarizing the relevant *Bearden* principles as follows:

The *sine qua non* of a *Bearden-* or *Rainwater*-style claim, then, is that the State is treating the indigent and the non-indigent categorically differently. Only someone who can show that the indigent are being treated systematically worse "solely because of [their] lack of financial resources"—and not for some legitimate State interest—will be able to make out such a claim.

*Id.* at 1260 (quoting *Bearden*, 461 U.S. at 661); *see also Rodriguez*, 411 U.S. at 20 ("The individuals, or group of individuals, who constituted the class discriminated against in our prior cases shared two distinguishing characteristics: because of their impecunity they were completely unable to pay for some desired benefit, and as a consequence, they sustained an absolute deprivation of a meaningful opportunity to enjoy that benefit.").

Citing *Rodriguez*, the *Walker* Court noted that an indigent had to show an *absolute* deprivation of a benefit in order for *Bearden*'s level of heightened scrutiny to apply. 901 F.3d at 1261–

62. It concluded that the indigent arrestees did not satisfy that standard; the plaintiffs did not suffer an absolute deprivation because they "merely" had to "wait some appropriate amount of time to receive the same benefit as the more affluent. Indeed, after such delay, they arguably receive[d] preferential treatment, in at least one respect, by being released on recognizance without having to provide any security. *Id.* Such a scheme does not trigger heightened scrutiny." *Id.*; *cf. Jones*, 975 F.3d at 1056 (Lagoa, J., concurring) (noting that a scheme that provides indigents alternative avenues to the attainment of a state-created benefit does not constitute an absolute deprivation).

After concluding that the indigents did not qualify for *Bearden* scrutiny—because they merely had to wait a brief period of time to obtain their release at a hearing and were thus not deprived of it absolutely—the *Walker* Court concluded that

> Walker failed to make the necessary showing that he is likely to succeed on the merits of his claim that the Standing Bail order is unconstitutional. Neither the 48-hour window for a bail determination nor the use of an adversarial bail hearing in lieu of an affidavit-based process runs afoul of the Constitution.

901 F.3d at 1269.

The district court here was not blind to the existence of *Walker* and *Rainwater*. It examined both cases in its analysis and concluded that neither compelled a finding that the bail system in Cullman County was constitutional. It instead found that two

salient differences between *Walker* and this case obligated the opposite result—that Cullman County operates its bail system in an unconstitutional manner.  We turn to those differences now.

First, in *Walker*, the bail order guaranteed a bail hearing to all criminal defendants who could not post bond within forty-eight hours.  *Id.* at 1252.  This was vitally important to the *Walker* Court, both because the Supreme Court in *County of Riverside v. McLaughlin*, 500 U.S. 44, 56 (1991), held that forty-eight hours was an appropriate period of time within which to hold probable cause determinations and because the Fifth Circuit, in *ODonnell*, imported that forty-eight-hour rule into the bail context.  *See Walker*, 901 F.3d at 1266–67.

Second, and just as important, the bail order in *Walker* guaranteed indigent arrestees release on a recognizance bond immediately upon proving their indigency.  *See id.* at 1252 ("If the court finds that the defendant is indigent under that standard, 'then he/she shall be subject to release on recognizance without making a secured bail.'  If no hearing is held within 48 hours, 'then the accused shall be released on a recognizance bond.'").  In other words, the only purpose of the bail hearing in the City of Calhoun was to determine whether the arrestee was indigent in reference to federal poverty guidelines.

In this case, however, indigent arrestees in Cullman County are entitled to a hearing within seventy-two hours and they are not released immediately upon a finding of indigency.  Rather, at their initial bail hearings, they must show not only that they are indigent,

but also that they are not a flight risk or a danger to the community. But neither of these differences—neither the wait of only forty-eight hours rather than seventy-two hours nor the additional considerations of flight risk and danger—compel a departure from the holdings of *Walker* and *Rainwater*, and the district court was wrong to conclude otherwise.

First, as to the forty-eight-hour requirement, the district court seemed to conclude that *Walker* established a bright-line rule that a bail hearing must be held within forty-eight hours, not seventy-two hours as guaranteed by Cullman County's Standing Bail Order. But *Walker* did nothing of the sort. True, the *Walker* court found a bail system constitutional *because* it provided for hearings within forty-eight hours. But that timeframe was merely because the system under consideration imposed that deadline not because the court mandated it. Thus, the *Walker* decision did not establish a bright-line rule. Instead, the Court concluded that a forty-eight-hour deadline was "presumptively constitutional." *Walker*, 901 F.3d at 1266; *see also id.* at 1267 n.13 ("We are satisfied that *McLaughlin* establishes at least a 48-hour presumptive safe harbor for making bail determinations without deciding if that safe harbor extends longer."). Rather, it was the Fifth Circuit, in *ODonnell*, that concluded federal due process rights guaranteed a bail determination within forty-eight hours. 892 F.3d at 160 ("We conclude that the federal due process right entitles detainees to a hearing within 48 hours.").

But the Eleventh Circuit was no longer part of the Fifth when *ODonnell* was decided,[6] and we are thus free to conclude otherwise. And there are good reasons to do so. In the federal criminal system, for example, a district court is free to delay a bail hearing for arrestees that pose a flight risk or other enumerated factors by three days after an arrestee's initial appearance—and that does not include intervening weekends and holidays. *See* 18 U.S.C. § 3142(f)(2) ("The hearing shall be held immediately . . . unless that person, or the attorney for the Government, seeks a continuance. Except for good cause, a continuance on motion . . . of the attorney for the Government may not exceed three days (not including any intermediate Saturday, Sunday, or legal holiday)."). Upon a showing of good cause, the bail hearing may be scheduled even *more* than three days after the initial appearance. *See id.*

More importantly, the forty-eight-hour window within which the Supreme Court has mandated probable cause determinations to be held, and which the Fifth Circuit imported into the bail context, serves a fundamentally distinct purpose from the setting of bail. A probable cause finding determines whether the government has a basis to hold a criminal defendant in the first instance—i.e., whether the state may detain him *at all*. *See Gerstein*,

---

[6] As the dissenting opinion recognizes, *ODonnell* is no longer good law in the Fifth Circuit. Dis.Op. at 41. While it is true that the *en banc* Fifth Circuit did not reach the merits of *ODonnell*'s analysis of the challenge to the bail system, *see Daves*, 22 F.4th at 528 ("Our decision today does not reach the merits."), we disagree with that analysis, as explained in our decision.

420 U.S. at 124–25 ("Whatever procedure a State may adopt, it must provide a fair and reliable determination of probable cause *as a condition for any significant pretrial restraint of liberty*." (emphasis added)). As a matter of logic, this threshold showing that a State has the ability to arrest and detain a criminal defendant should have to be made before the State determines the terms of pretrial *release*. Though, of course, as a matter of efficiency, it may make sense to hold both at the same time. *See McLaughlin*, 500 U.S. at 58. Ultimately, where the constitutional line must be drawn is a question for a separate case. Here, we simply must determine whether the seventy-two-hour deadline before us is facially unconstitutional, and we are satisfied that it is not.

Second, the fact that indigent defendants in Cullman County must show that they are not a flight risk or danger to the community in order to secure release, while the defendants in the City of Calhoun were released immediately upon proving their indigency, is not constitutionally significant. Nowhere in *Walker* did we suggest that this additional showing would somehow result in a constitutional infirmity. In fact, we made clear that the City of Calhoun took it upon itself to subject indigent arrestees to *better* treatment than affluent arrestees. *See* 901 F.3d at 1261–62 (explaining that after delay indigents experienced waiting for their hearing, "they arguably receive preferential treatment, in at least one respect, by being released on recognizance without having to provide any security" and that "[s]uch scheme does not trigger heightened

56                    Opinion of the Court                    18-13894

scrutiny under the Supreme Court's equal protection jurispru-
dence.")

It may go without saying, but the Equal Protection Clause
does not mandate that the indigent receive preferential treatment.
In fact, "at least where wealth is involved, the Equal Protection
Clause does not require absolute equality or precisely equal ad-
vantages." *Rodriguez*, 411 U.S. at 24.  Cullman County, however,
has chosen to place all arrestees on equal footing: all are released as
soon as they are able to show that they are not a flight risk or dan-
ger to the community.  The affluent satisfy this requirement by
posting bail; the indigent do so by making what, in the eyes of the
County, is an equal showing[7]—appearing at a hearing where a
judge determines their indigency, their danger level, and flight risk.

We do not believe that the difference between the hearing
in *Walker* and the hearing in this case—that, in addition to showing
indigency, an arrestee here also has to show that he is not a flight
risk or danger to the public—is constitutionally significant.  Once

_____

[7] Although we acknowledge that posting bail is not the equivalent of a judge's
finding that an arrestee is not a danger to the public, the procedures do account
for the danger factor in that law enforcement is expected to file a "Bail Request
Form" to avoid the release of any arrestee who might be a danger to the pub-
lic.  Although that too is not a precise equivalent of the hearing that the indi-
gent undergo, it is consistent with the laudable goal of promoting prompt re-
lease where feasible and consistent with the safety of the public.  We therefore
conclude that the hearing provided for in the instant Standing Bail Order is a
"constitutionally permissible secondary option." *See Walker*, 901 F.3d at 1260.

18-13894            Opinion of the Court            57

the arrestee is temporarily detained pending a hearing to determine indigency, as in *Walker*, it is eminently reasonable to also determine in that same hearing the flight risk and danger issues. Indeed, our *Walker* and *Rainwater* decisions provide strong support for the propriety of the more encompassing hearing provided for in the instant Standing Bail Order. In *Walker*, we described *Rainwater* as holding:

> [T]he court approved the "[u]tilization of a master bond schedule" without applying any heightened form of scrutiny. It explained that a bond schedule "provides speedy and convenient release for those who have no difficulty in meeting its requirements." Of course, if the bond schedule provided "speedy" release to those who can meet its requirements, it necessarily provided less speedy release to those who could not. Nevertheless, the *Rainwater* court upheld the scheme because it gave indigent defendants who could not satisfy the master bond schedule a constitutionally permissible secondary option: a bail hearing at which the judge could consider "all relevant factors" when deciding the conditions of release.

901 F.3d at 1260 (second alteration in original) (internal citations omitted) (quoting *Rainwater*, 572 F.2d at 1057–58). The hearing provided for in the procedures at issue in *Rainwater* were not substantially different from the hearing provided for in the instant Standing Bail Order. Thus, contrary to the position put forth by Hester and the district court, we cannot conclude that the

additional consideration of flight risk and danger at the hearing is constitutionally significant.

It is important to reiterate here that bail serves a purpose, and that purpose is not punitive. Bail is a liberty preserving device—it balances the community's interest in security and the defendant's interest in liberty by allowing that defendant to "deposit . . . a sum of money subject to forfeiture," which serves as "assurance of the presence of an accused" at trial. *Stack*, 342 U.S. at 5. Since before the days of the Magna Carta, society has used the posting of surety as a mechanism for the accused to secure their pretrial release. *See* Brief for Am. Bail Coal. & Ga. Ass'n of Prof'l Bondsmen as Amici Curiae Supporting Appellants at 6–8, *Hester v. Gentry* (No. 18-13894). So those who can post bail, and those who cannot, are separated by more than wealth. Only the former group has shown that the purposes of bail have been satisfied.

We thus will not hold that requiring indigent arrestees to appear for a hearing and make a showing of their flight risk and danger to the community mandates heightened scrutiny under *Bearden*'s framework of equal protection. The indigent may obtain release upon a showing that they can satisfy the purposes of bail, by allowing a judge to make written findings about their flight risk and danger to the community. Thus, the *Rodriguez* framework mandates that only rational basis review applies to the bail system. *See* 411 U.S. at 17 (providing the "framework for our analysis" requires a court to first determine whether a system "operates to the disadvantage of some suspect class or impinges upon a

fundamental right explicitly or implicitly protected by the Constitution, thereby requiring strict judicial scrutiny," and, if not, to apply rational basis review); *see also McGinnis v. Royster*, 410 U.S. 263, 269–70 (1973) (evaluating a claim that good-time-credit scheme that benefitted the wealthy who were able to afford bail violated equal protection under rational basis); *ODonnell v. Goodhart*, 900 F.3d 220, 226 (5th Cir. 2018) ("An Equal Protection Claim that an indigent 'person spends more time incarcerated than a wealthier person' is reviewed for a rational basis." (quoting *Doyle v. Elsea*, 658 F.2d 512, 518 (7th Cir. 1981))), *abrogated by Daves*, 22 F.4th 522; *Smith v. U.S. Parole Comm'n*, 752 F.2d 1056, 1059 (5th Cir. 1985) (same); *Doyle*, 658 F.2d at 518 (evaluating a claim that indigents spend more time in prison than the wealthy only for rational basis).

Under rational basis review, laws must be rationally related to a legitimate government interest." *Vance v. Bradley*, 440 U.S. 93, 97 (1979) (quoting *Mass. Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976). Laws "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification" drawn by the law. *See FCC v. Beach Commc'ns, Inc.*, 508 U.S. 307, 313 (1993). "[W]e will not overturn such a statute unless the varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that we can only conclude that the legislature's actions were irrational." *Vance*, 440 U.S. at 97.

Here, we conclude that Cullman County's bail system satisfies rational basis review. As we held in *Rainwater*, states maintain not only a legitimate but a "compelling interest in assuring the presence at trial of persons charged with crime." 572 F.2d at 1056. And Cullman County's bail system is rationally related to that interest— requiring defendants to post surety will result in more of those defendants appearing for trial.

Ultimately, this case falls firmly within the purview of *Rainwater*. Here, as in *Rainwater*, only arrestees who have the means to post bail are immediately released. Those who are not so able are held for a brief time period before appearing at an individualized bail hearing. At both the hearing in *Rainwater* and the hearing here, the judge will consider all relevant factors and *must* impose the least onerous condition of release that will satisfy the purposes of bail—i.e., a secured appearance bond may be imposed on the indigent only if it is the only method that will assure the presence of that criminal defendant at trial.[8] In *Rainwater*, we held that this

---

[8] The Standing Bail Order's explicit memorialization of this "least onerous condition" requirement separates Cullman County's bail system from those which courts have held (or suggested) were constitutionally infirm. For example, in *Rainwater*, we noted that the mechanistic application of a bail schedule, "without meaningful consideration of other possible alternatives," would violate the Supreme Court's wealth-discrimination jurisprudence by automatically imposing money bail on those who are unable to afford it. 572 F.2d at 1057; *see also In re Humphrey*, 482 P.3d 1008, 1018 (Cal. 2021) (collecting cases). Here, however, judges must consider an arrestee's financial situation

scheme was constitutional, and we reiterate that holding now. And *Walker* likewise supports our holding. Accordingly, we reject this claim.

## 2. *Due Process*

The district court also concluded that Cullman County's bail procedures violate arrestees' rights of procedural and substantive due process. In this respect, the district court identified four problems with Cullman County's system: (1) the lack of adequate notice of the factors to be considered in setting bail; (2) the lack of a guaranteed opportunity to be heard; (3) the lack of a uniform evidentiary standard to be used in denying bail; and (4) the lack of detailed factual findings. To remedy these supposed deficiencies, the district court directed the Sheriff of Cullman County to immediately release all bail-eligible criminal defendants from pretrial confinement unless it was prepared to submit a bail request for that defendant; if such a request was submitted, to inform the defendant—both orally and in writing—that a judge would have to find by clear and convincing evidence at an initial appearance that he was a flight risk or a danger to the community in order to be detained and to draft a new questionnaire to provide to the defendants, which would elicit further information regarding flight risk and danger to the community; to immediately release all criminal defendants if they did not receive an initial appearance within forty-eight hours

during his individualized bail hearing and may require money bail only if no less onerous condition of release would ensure his appearance at trial.

of arrest; to provide criminal defendants with liaison deputies who would assist them in filling out the new questionnaire; and to provide criminal defendants with an affidavit form in which the defendants could provide information about their financial means.

Despite nominally resting on the doctrines of both procedural due process and substantive due process, the district court did not significantly rely on the latter for any of its findings. Indeed, it discussed few substantive due process cases in its analysis, did not identify any fundamental right at issue, and did not seek to provide a remedy for any substantive due process violation.

This is unsurprising, as our precedent makes clear that the substantive due process claim is a nonstarter. Although in *Salerno*, the Supreme Court recognized that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception," it also stated that an arrestee may be incarcerated before trial "if he presents a risk of flight or a danger to witnesses." 481 U.S. at 749, 755 (internal citation omitted). And the Supreme Court ultimately permitted even preventive detention if the arrestee "pose[s] a threat to the safety of individuals or to the community which no condition of release can dispel." *Id.* at 755.

In *Walker*, this Court analyzed *Salerno* and concluded that it was a procedural due process case, not a substantive due process case. 901 F.3d at 1262–65. Pretrial detainees have no fundamental right to pretrial release. If they did, bail itself would be unconstitutional. But, of course, it is not—*Salerno* said as much. And Hester cannot "avoid the Supreme Court's holding [in *Salerno*] by

18-13894                Opinion of the Court                63

smuggling a substantive due process claim into the Equal Protection Clause." *Id.* at 1264–65; *see also Goodhart*, 900 F.3d at 228 ("The grant of automatic release smuggles in a substantive remedy via a procedural harm.  That goes too far.").

Each of the district court's findings do, however, fit squarely within the rubric of procedural due process.  Procedural due process "encompasses . . . a guarantee of fair procedure." *Zinermon v. Burch,* 494 U.S. 113, 125 (1990).  In due process analyses, "[t]he fundamental requirement of due process is the opportunity to be heard 'at a meaningful time and in a meaningful manner.'" *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)).  Due process "is not a technical conception with a fixed content unrelated to time, place and circumstances," but rather is "flexible" and "requires analysis of the governmental and private interests that are affected." *Id.* at 334 (first quoting *Cafeteria Workers v. McElroy*, 367 U.S. 886, 895 (1961) then quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)).  Thus, a standard analysis under the Due Process Clause proceeds in two steps: "We first ask whether there exists a liberty or property interest of which a person has been deprived, and if so we ask whether the procedures followed by the State were constitutionally sufficient." *Swarthout v. Cooke*, 562 U.S. 216, 219 (2011).  During that second step, we are guided by the balancing test of *Mathews*, in which we look to the nature of the private interest affected, the risk of erroneous deprivation, the value of additional

safeguards, and the government's interest, including any burdens. *See* 424 U.S. at 335.

In the pretrial detention context, procedural due process requires that the procedures used be "adequate to authorize the pretrial detention of at least some [persons] charged with crimes," whether or not they might be insufficient in some other circumstances. *Salerno*, 481 U.S. at 751 (alteration in original) (quoting *Schall v. Martin*, 467 U.S. 253, 264 (1984)). Answering that question requires "[t]wo separate inquiries": "First, does preventive detention . . . serve a legitimate state objective? And, second, are the procedural safeguards . . . adequate to authorize the pretrial detention[?]" *Schall*, 467 U.S. at 263–64 (citations omitted).

There is no question about the first inquiry. As we said in *Rainwater*, states maintain not only a legitimate, but a "compelling interest in assuring the presence at trial of persons charged with crime." 572 F.2d at 1056. The question thus becomes whether the procedural safeguards used by Cullman County are "adequate to authorize the pretrial detention."

Ultimately, we conclude—as the Supreme Court did in both *Schall* and *Salerno*—that the procedures presented to us pass that test, as "there is nothing inherently unattainable about a prediction of future criminal conduct." *See Salerno*, 481 U.S. at 751 (quoting *Schall*, 467 U.S. at 278). Or, more specifically, that there is nothing "inherently unattainable about a prediction" of flight risk or danger to the community.

Cullman County's procedures are specifically designed to further the accuracy of the danger to the community and flight risk inquiries. Before arrestees in Cullman County have their bail set (or are denied bail), they are presented with two forms that aid the judge in making a bail determination: an "Affidavit of Substantial Hardship," and a "Release Questionnaire." In the Release Questionnaire, the arrestee can provide information about his residence, employment, family situation, health, and criminal history for the purpose of ascertaining information that might be relevant to a pretrial release. It also asks for the contact information of his nearest living relatives, who may vouch for his character. In the Hardship Affidavit, the arrestee can provide information about his employment, assistance benefits, income, expenses, and assets. These two forms, collectively, provide pretrial detainees notice of the hearing to take place and give them an opportunity to present information relevant to the bail determination.

After these forms are filled out, they are presented to the bail-setting judge, who is guided by fourteen statutorily enumerated factors in making his decision on bail. *See* Ala. R. Crim. P. 7.2(a). These factors include inquiries into the defendant's character, criminal record, community standing, and employment history—each directed at ascertaining how likely it is the defendant will take flight before his next appearance. Cullman County's form order—titled, "Order On Initial Appearance and Bond Hearing"—includes these fourteen factors, and also provides the bail-setting judge with a fifteenth factor, "Other," where the judge can

66                    Opinion of the Court                    18-13894

enumerate any case-specific consideration that was not adequately represented in the enumerated factors.

At the bail hearing, the judge must give "the Defendant the opportunity to make a statement regarding his/her ability to post the bond currently set in this matter."[9]  And if the judge determines, after considering the relevant factors, that the setting of bail is the least onerous condition that will ensure that the purposes of bail are satisfied, the judge must notate which of the fifteen factors relevant to the bail determination led him to that conclusion.[10]

---

[9] The district court took issue with the Standing Bail Order's pronouncement that the court "*may* elicit testimony about the defendant's financial condition."  The district court concluded that this rendered the procedure constitutionally deficient, in that it did not guarantee arrestees the opportunity to be heard at their bail hearings.  But this clause is capable of a constitutional construction—i.e., the court *may* elicit testimony if the defendant seeks to offer it.  And indeed, the scant evidence presented on the issue is consistent with this interpretation.  The form order that judges must complete after the hearing makes clear that they are to give arrestees the opportunity to speak.  And as the district court itself admitted, the only judge who testified on the matter—Judge Turner—made clear that he always speaks with arrestees at their bail hearing, and the "record does not indicate whether other judges in Cullman County" deny arrestees that right.  Given the forms and record presented, there is simply no basis to presume that arrestees in Cullman County are denied an opportunity to be heard.

[10] The district court also took issue with the form order used by judges in Cullman County, preferring instead that the judges announce their findings orally on the record.  But most of the factors Alabama requires judges to consider refer to binary propositions that either are or are not present in the arrestee's case.  Requiring judges to make oral findings, which would require the ordering of a transcript before review, would inject unnecessary procedural

18-13894                Opinion of the Court                67

After the hearing, arrestees—if unhappy with their bail de-termination—are entitled to file a motion to reduce their bond, which may be granted upon a showing of mere "good cause." *See* Ala. R. Crim. P. 7.4(b). And indigent arrestees are entitled to the aid of counsel in the filing of that motion.

These safeguards are sufficient, and they are similar to the procedures that the Supreme Court found "extensive" and "more exacting" than necessary in *Salerno*. There, the Supreme Court was tasked with assessing the constitutionality of the Bail Reform Act. *Salerno*, 481 U.S. at 751–52. The Supreme Court noted that detainees had the right to counsel at the detention hearing and were permitted to testify, that the judicial officers were guided by statutorily enumerated factors relevant to the determination and had to find that bail was necessary by clear and convincing evi-dence and detail their findings in a written order, and, finally, that detainees were entitled to appellate review of the detention deci-sion. *See id.* The Supreme Court determined that these proce-dures were "extensive," "more exacting" than necessary, and "far exceed[ed] what [it] found necessary to effect limited postarrest de-tention" in other cases. *Id.* at 752.

---

complication into the process. *Cf. McLaughlin*, 500 U.S. at 53 (noting that defendants might be disserved by adding procedural complexity into the al-ready complicated pretrial system); *ODonnell*, 892 F.3d at 160 ("We decline to hold that the Constitution requires the County to produce 50,000 written opinions per year to satisfy due process.").

The differences between *Salerno* and this case are not so different as to warrant a departure from that holding. The only salient differences are that detainees in Cullman County are not entitled to counsel at their initial bail hearing and that judges in Cullman County are not required to meet the clear and convincing evidence standard before imposing bail. But both of these differences are mitigated by Cullman County's procedure for obtaining review of the bail determination. Indeed, indigent detainees in Cullman County are entitled to the aid of counsel in obtaining review of their bail determinations and can secure a modification of their detention orders upon a showing of "good cause."

The district court reached the opposite conclusion and found that the procedures in Cullman County were constitutionally infirm by relying on the Fifth Circuit's decision in *ODonnell*. But the facts of that case stand in stark contrast to the case before us. In its now vacated opinion, the Fifth Circuit found that Harris County engaged in an unconstitutional "custom and practice" that resulted in "the *automatic* imposition of pretrial detention on indigent misdemeanor arrestees." *ODonnell*, 892 F.3d at 160–61. The district court in *ODonnell* reached that same finding only after conducting an exhaustive review of, *inter alia*, "nearly 300 written exhibits, in addition to 2,300 video recordings of bail-setting hearings" in Harris County. *ODonnell v. Harris County*, 251 F. Supp. 3d 1052, 1061 (S.D. Tex. 2017). The Fifth Circuit, after reviewing that same record, found that the evidence showed that Harris County officers "instructed" indigent defendants "not to speak" at bail

hearings and that the defendants were "not offered any opportunity to submit evidence of relative ability to post bond at the scheduled amount." 892 F.3d at 153–54.

None of these observations are true of this case. Arrestees in Cullman County are given paperwork before their bail hearings that provides them with notice of the upcoming proceeding, and there is no suggestion that officers (or anyone else for that matter) instructs them not to speak. And the district court did not conclude, nor is there any suggestion in the record, that judges "automatically" impose monetary bail conditions on indigent arrestees. To the contrary, the Standing Bail Order makes clear that judges must impose the least onerous condition of release, which will satisfy the purposes of bail.

In short, pretrial detainees in Cullman County are not deprived of due process at their bail determinations. They are provided a hearing before an impartial judge, notice of that hearing, and there is no evidence that they are being denied an opportunity to be heard at the hearing. Furthermore, the judge's bail determination may be modified upon a showing of good cause, and the judge must make written findings of fact specifying which factors he considered in setting the amount of bail. This satisfies the Due Process Clause.

## IV.    CONCLUSION

Under our plenary de novo review of the facial constitutionality of the current Cullman County bail system, we conclude that

the district court erred both in finding that the bail system discriminated against the indigent and in finding that the bail system deprived pretrial detainees of procedural due process.  Thus, the district court also erred in concluding that Hester has shown a substantial likelihood of success on the merits, and the issuance of the preliminary injunction was thus in error.

For all these reasons, we **AFFIRM** the district court's decision not to abstain from hearing this case under *Younger* and **AFFIRM** the court's denial of Sheriff Gentry's motion to dismiss. We **DISMISS** the Judicial Defendants from the present appeal.  And we **REVERSE** the district court's entry of a preliminary injunction and **REMAND** for further proceedings consistent with this opinion.

18-13894          ROSENBAUM, J., Dissenting          1

ROSENBAUM, Circuit Judge, dissenting in part:

Cullman County justifies setting bonds indigent arrestees can't afford and thereby de facto detaining them under its current bail practices, based on its interests in ensuring arrestees' appearances at trial and in protecting the community from arrestees it deems a danger to the public. No doubt these are valid and compelling interests. And they could justify a bail system where de facto pretrial detention occurred only when no other means could reasonably satisfy these interests, and the same rules applied to the indigent and non-indigent alike.

But that does not describe Cullman County's bail system. Not even close.

Rather, risk of appearance failure and danger to the community have real relevance in Cullman County's bail system, if at all, as they pertain to only the indigent, who can sit in jail for up to a month or more without having a meaningful opportunity to be heard on bond. Meanwhile, within ninety minutes of arrest, the nonindigent bypass both pretrial detention and the County's stated concerns about failure to appear and danger by simply paying a predetermined secured bond that corresponds to the offense for which they were arrested. That secured bond does not even purport to account for any danger to the community the nonindigent

2                    ROSENBAUM, J., Dissenting                    18-13894

arrestees might present.  Nor does it consider any actual flight or
failure-to-appear risk.[1]

Put simply, in practice, all things being equal between an in-
digent and nonindigent arrestee in Cullman County, only the indi-
gent one will undergo de facto detention.  That is different treat-
ment concerning effective detention, based solely on indigent sta-
tus.

Of course, the County has every right to decline to award
lower secured bail amounts that arrestees can pay, if the County
reasonably determines that those bail amounts are necessary to en-
sure the defendant's appearance and the safety of the public.  But
that secured bail must be necessary, and the County cannot choose
to apply the appearance and safety criteria to only the indigent.

Nor can it deprive indigent defendants of due process of law
in imposing de facto detention.  But Cullman County doesn't even
appoint counsel for indigent defendants' initial bail hearings, and

---

[1] Risk of flight and failure-to-appear risk are not the same thing.  While all risks
of flight present failure-to-appear risks, not all failure-to-appear risks qualify as
risks of flight.  People who have no intention of fleeing may fail to appear for
various reasons.  For example, Judge Turner of Cullman County testified at
the preliminary-injunction hearing that people might miss court because they
don't have transportation or can't miss work because they are on a probation-
ary period such as the first 90 days of employment with a new employer.
Though these types of failures to appear may not be acceptable, as Judge
Turner also acknowledged, different and more appropriate fixes are available
to address them than the solutions used for people who flee.

18-13894              ROSENBAUM, J., Dissenting                    3

indigent defendants generally must sit in jail for a month before their appointed counsel can obtain reconsideration of the bond imposed when counsel wasn't present.

Cullman County judges no doubt act in good faith in applying Cullman County bail procedures. But that does not remedy the problems with Cullman County's bail procedures (and practices). On the contrary, compounding the problems I have mentioned, the judge who imposes bond need not apply any particular standard of proof when determining that a given bond is necessary to ensure the defendant's appearance or the safety of the community. He also doesn't have to state the reasons for his decision, rendering it even harder for counsel to challenge the determination when the reconsideration motion is finally heard.

In short, Cullman County's current bail system unconstitutionally violates indigent arrestees' Fourteenth Amendment equal-protection and due-process rights. The majority opinion avoids this conclusion only by disregarding the facts that the district court found about how Cullman County's current bail system operates in practice.

Yet the district court held a two-day evidentiary hearing and reviewed evidence that revealed the County's actual practices in implementing the Standing Bail Order. The parties do not so much as suggest that the district court's factual findings are clearly erroneous, and the Majority Opinion does not take that step, either. Nor could it. The record contains no basis to conclude that the district court's factual findings are clearly erroneous.

So we must accept them.  And when we apply the law to the facts the district court found, we must conclude that when it comes to setting bail (and thus imposing de facto pretrial detention on indigent arrestees), the County holds indigent arrestees to a different and higher standard than nonindigent arrestees.  And it does so based solely on the fact that they are indigent.  Not only that, but the processes Cullman County uses to set bond for the indigent fail to provide them due process.  Because these deficiencies violate the Fourteenth Amendment, I respectfully dissent.

I divide my discussion into four parts.  I begin by explaining in Section I why the Majority Opinion is not at liberty to ignore the district court's factual findings in its analysis.  Section II then catalogs the district court's relevant factual findings.  In Section III, I review why pretrial release is important—that is, the significant advantages pretrial release bestows on a defendant.  In Section IV, I explain why Cullman County's Standing Bail Order release system violates the Fourteenth Amendment's guarantees of equal protection and due process.

I.    The Majority Opinion cannot ignore the district court's factual findings

   A.    *We may disregard a district court's factual findings only if we find them to be clearly erroneous*

Here, the district court entered a preliminary injunction, enjoining Cullman County's actual bail practices under the Standing Bail Order.  We have always reviewed for clear error a district

18-13894            ROSENBAUM, J., Dissenting            5

court's factual findings supporting an order on a motion for preliminary injunction. *See, e.g.*, *S.E.C. v. Unique Fin. Concepts, Inc.*, 196 F.3d 1195, 1198 (11th Cir. 1999).

That standard of review applies whether the district court based its factual findings on live testimony, documentary evidence, or any other type of admissible evidence. *See* Fed. R. Civ. P. 52(a)(6) ("Findings of fact, whether based on oral or other evidence, must not be set aside unless clearly erroneous . . . ."). As the Supreme Court has emphasized, the clearly erroneous standard of review governs even "when the district court's findings do not rest on credibility determinations, but are based instead on physical or documentary evidence or inferences from other facts." *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985). We defer to the original finder of fact not only because she is in a better position to make determinations of credibility but also because "[t]he trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise." *Id.*

A finding of fact is clearly erroneous only when "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Id.* at 573 (citation and quotation marks omitted). So long as the district court's account of the evidence "is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.* at 574. So even when "two

6　　　　　　　Rosenbaum, J., Dissenting　　　　　18-13894

permissible views of the evidence exist, the factfinder's choice be-
tween them cannot be clearly erroneous." *Id.*

> B.　　*The Majority Opinion wholly ignores the district
> court's factual findings without finding them to be
> clearly erroneous*

Hester raised two challenges to the Standing Bail Order.
The first—a facial challenge—alleged that the procedures the
Standing Bail Order calls for violate the Fourteenth Amendment.
But second, Hester also challenged, as the district court explained,
"the way in which Cullman County implements [the Standing Bail
Order]"—that is, Cullman County's actual practices.  For that rea-
son—and without objection by the defendants—after a two-day ev-
identiary hearing, the district court made factual findings about
Cullman County's actual practices under the Standing Bail Order
and based its entry of the preliminary injunction here at least in part
on those findings.

But nowhere does the Majority Opinion discuss any of those
findings.  It doesn't find them clearly erroneous.  Indeed, no party
even argued that they were.

Rather, the Majority Opinion sua sponte just dismisses the
district court's factual findings about how Cullman County imple-
ments its current bail system.  The Majority Opinion does this, con-
trary to Hester's challenge to Cullman County's actual practices
and the district court's treatment of that challenge, by simply de-
ciding that Hester's challenge was necessarily only a facial

18-13894          Rosenbaum, J., Dissenting          7

challenge to the Standing Bail Order. *See* Maj. Op. at 32–33. In support of this determination, the Majority Opinion offers two justifications: (1) "Hester cannot trace his injury to the current operative bail system" because he was released before it went into effect, *id.* at 32; and (2) "the bail scheme at issue here had only been in place for sixteen days before the district court held its preliminary injunction hearing," *id.* at 33 (emphasis omitted).

Upon examination, though, these reasons don't hold up. I address them in reverse order.

To be sure, the bail scheme at issue had been effective for sixteen days before the district court's evidentiary hearing. But as Section II of this dissent—which summarizes the evidence taken at the hearing—shows, that was more than enough time for the County to establish certain uniform practices under the newly adopted Standing Bail Order. In fact, the district judge based her factual findings about Cullman County's actual bail practices on testimony from the Sheriff himself and from one of only two Cullman County district judges who preside over bond hearings—the very Cullman County employees who are responsible for implementing the Standing Bail Order's procedures. It is difficult to imagine that anyone else would have been more qualified to testify to the County's actual practices under the Standing Bail Order.

The district court's factual findings show that certain Cullman County bail practices under the Standing Bail Order do not conform to the Standing Bail Order and never did. But they also show that Cullman County does apply some uniform procedures

8                    ROSENBAUM, J., Dissenting                    18-13894

when it sets bail—those procedures just are not true to the Standing Bail Order.

To be sure, the district court noted that "the defendants were able to offer little evidence concerning the implementation of the new policy," but it also found that the evidence established Cullman County engages in certain uniform practices that diverge from what the Standing Bail Order calls for.

For example, the district court found without qualification that "officials in Cullman County do not handle bail requests in a manner consistent with the new standing order." While I discuss in Section II of this dissent how the two processes differ, the point for now is that the district court made specific factual findings about how some of Cullman County's actual bail practices do not follow the Standing Bail Order.

And conspicuously, no party even suggests that the district court's factual findings about Cullman County's implementation of the Standing Bail Order were incorrect or unfair because they were based on sixteen days of functioning.

That the Standing Bail Order had been in effect for sixteen days when the evidentiary hearing occurred does not somehow void the resulting evidence and corresponding factual findings about how Cullman County uniformly applied the Standing Bail Order to all state-court arrestees throughout that time. And that is especially so when Cullman County has not even argued that the evidence on which the district court relied does not provide an

accurate picture of what Cullman County's actual bail practices are. That a longer period of operation might have allowed for the presentation of evidence about more facets of how Cullman County executes the Standing Bail Order likewise does not provide a reason to dismiss the district court's factual findings about the aspects of Cullman County's bail practices that the evidence did illuminate. These rationales do not even suggest that the district court's view of the evidence before it was not at least "plausible," let alone support a "definite and firm conviction that a mistake has been committed." *See Anderson*, 470 U.S. at 574.

So the mere fact that Cullman County had been operating under the Standing Bail Order for sixteen days at the time of the evidentiary hearing does not excuse the Majority Opinion from its duty to either explain why the facts the district court found are clearly erroneous (a task even the defendants do not ask the Court to engage in) or conduct its analysis by applying the law to the facts the district court found. Yet the Majority Opinion does neither before wholesale jettisoning the district court's factual findings.

As for the Majority Opinion's reasoning that "Hester cannot trace his injury to the current operative bail system" because he was released before it went into effect, Maj. Op. at 32, readers might notice that sounds an awful lot like a reason why Hester lacks standing to challenge the Standing Bail Order at all. We have explained that to establish standing, an Article III jurisdictional requirement, a plaintiff must show an injury in fact that is fairly traceable to the defendant's conduct, and he must demonstrate that the

injury will likely be redressed by a favorable decision from us. *Johnson v. 27th Ave. Caraf, Inc.*, 9 F.4th 1300, 1311 (11th Cir. 2021). Here, the Majority Opinion concedes that Hester can't show that the injury he suffered is related in any way to the Standing Bail Order, which seems to suggest that Hester lacks standing to challenge it.

The Majority Opinion sidesteps this sticky standing stumbling block by viewing Hester's challenge to the current bail system through the lens of mootness as it pertains to Hester's challenge to Cullman County's pre-Standing Bail Order bail system. *See* Maj. Op. at 34–40. As the Majority Opinion's reasoning goes, because Cullman County stopped operating under its pre-Standing Bail Order system when it adopted the Standing Bail Order, Hester's efforts to secure injunction of the pre-Standing Bail Order system are moot. *See id.* at 36 ("Hester's challenge to Cullman County's former bail procedures is now moot."). But, the Majority Opinion concludes, Hester's challenge still survives the County's adoption of the Standing Bail Order under the voluntary-cessation exception to mootness. *See id.* at 38–40.

Under that exception, voluntary cessation of allegedly illegal conduct does not necessarily render a case moot and deprive the court of jurisdiction. *Flanigan's Enters. Inc. of Ga. v. City of Sandy Springs*, 868 F.3d 1248, 1255 (11th Cir. 2017) (en banc), *abrogated on other grounds by Uzuegbunam v. Preczewski*, 141 S. Ct. 792 (2021). That's to prevent a defendant from ceasing its allegedly

offensive conduct just long enough to obtain dismissal of a lawsuit and then reinstate the complained-of behavior. *See id.*

We have explained that the voluntary-cessation exception does not apply when "the totality of th[e] circumstances persuades the court that there is no reasonable expectation that the government entity will [return to its prior allegedly offending conduct]." *Id.* at 1257. I assume without deciding that the Majority Opinion is right that the voluntary-cessation exception applies here.

But in that case, the entire basis for concluding this matter is not moot is that the County may continue to violate state arrestees' rights under the Standing Bail Order in the same ways Hester alleged it did before it adopted and implemented the Standing Bail Order—mainly by continuing to apply different considerations to the indigent and nonindigent when making release decisions, and by continuing to impose secured bonds indigent defendants cannot meet when less restrictive conditions will satisfy the County's concerns.

Yet the Majority Opinion then just dismisses the district court's factual findings showing that, in fact, in implementing the Standing Bail Order, Cullman County has continued these very practices that Hester complained of when he challenged the original policy. As the district court explained, "[T]he mootness doctrine does not foreclose Mr. Hester's efforts to obtain relief because although the Cullman County Circuit Court has revised its written criminal pretrial procedures, the record demonstrates that the defendants do not fully comply with the new written procedures." In

other words, the district court concluded that the voluntary-cessation doctrine saved the case from mootness, based on Cullman County's actual practices under the Standing Bail Order—not on the face of the Standing Bail Order itself.

But on appeal, on the merits, the Majority Opinion ignores the factual findings that establish the very basis for why the case is not moot:  that the County uniformly implements the Standing Bail Order not strictly by the Order's terms but in a way that continues some of the very same practices Hester challenged as unconstitutional before the County adopted the Standing Bail Order.

The Majority Opinion cannot have it both ways.  Either the case as it relates to the County's pre-Standing Bail Order procedures is moot because the County ceased all aspects of its challenged pre-Standing Bail Order conduct when it adopted the Standing Bail Order—in which case we lack jurisdiction—or the case is not moot because the County allegedly continued at least some of its challenged pre-Standing Bail Order practices after adopting the Standing Bail Order—in which case we must consider the district court's factual findings about what those continuing practices were.

Instead, though, the Majority Opinion blazes a third and unauthorized path:  without finding them to be clearly erroneous, the Majority Opinion, on the merits, simply throws out the facts the voluntary-cessation exception necessarily relies on to establish jurisdiction and skips any review of Hester's claim and the district court's analysis based on those factual findings.  I am unaware of

18-13894          Rosenbaum, J., Dissenting          13

anything that allows the Majority Opinion to do that. Nor does the Majority Opinion's citation of *Pugh v. Rainwater*, 572 F.2d 1053 (5th Cir. 1978) (en banc), and *Walker v. City of Calhoun*, 901 F.3d 1245 (11th Cir. 2018), save the day for it.

C.     *Contrary to the Majority Opinion's contention, no precedent authorizes the Majority Opinion to wholly dismiss the district court's findings without finding them to be clearly erroneous*

In *Rainwater*, the plaintiffs, Florida pretrial detainees, challenged certain aspects of Florida's bail system as it existed when the plaintiff detainees brought suit. *See Rainwater*, 572 F.2d at 1055. After the district court ruled on the constitutionality of the Florida plaintiffs' claims about that bail system and while the case was pending on appeal before our predecessor Court, Florida's Supreme Court adopted a new bail system. *Id.* The Former Fifth Circuit found that the Florida plaintiffs' claims about the original bail system were moot. *Id.* at 1058-59; *see also id.* at 1059 n.10. But it facially reviewed the constitutionality of the newly adopted bail system. *See id.* at 1059. Our predecessor Court did not explain the jurisdictional basis allowing it to do so.

*Rainwater* does not justify the Majority Opinion's decision to dismiss the district court's factual findings here. For starters, in *Rainwater*, there were no district-court findings about the way the new Florida rule operated because the new Florida rule was never in effect when *Rainwater* was pending before the district court. So it was impossible for our predecessor Court to have ignored factual

14                ROSENBAUM, J., Dissenting                18-13894

findings about the new system.  That's very different from the sit-
uation here, where Cullman County's new system was operational
when the district court held its two-day evidentiary hearing, and
the district court heard evidence and made factual findings about
the County's actual new practices.

Not only that, but the *Rainwater* Court never went through
any jurisdictional analysis before upholding Florida's new bail rule.
The Majority Opinion invokes *Rainwater*'s acknowledgment of
the mootness of the challenge there to the old bail system to try to
bootstrap an imagined holding about why the *Rainwater* Court en-
joyed jurisdiction to rule for the first time on the new bail rule.  *See*
Maj. Op. at 36–37.

But our decision on the merits in *Rainwater* after failing to
acknowledge or address the jurisdictional question remaining after
the Court declared the challenge to the old system there moot did
not create precedent on whether the Court actually enjoyed juris-
diction under the circumstances of the case.  *See In re Bradford*, 830
F.3d 1273, 1278 (11th Cir. 2016).  As we have said, "when it comes
to questions of jurisdiction, we are bound only by explicit hold-
ings."  *Id.*  So for this reason and because *Rainwater* did not involve
any factual findings on the new rule there, *Rainwater* obviously
could not have created precedent for the proposition that only a
facial challenge to a newer policy can survive the mooting of an old
policy, when a district court reviews evidence and makes factual
findings about the actual operation of the newer policy.

As for *Walker*, it is similarly uninstructive here.  In *Walker*, Georgia arrestees challenged the City of Calhoun's then-existing bail system.  *See* 901 F.3d at 1251–52.  While the case was pending, the City of Calhoun altered its prior bail policy by issuing a standing bail order.  *Id.* at 1252.  The district court enjoined the new policy because it found that the standing bail order's stated procedures were unconstitutional.  *See Walker v. City of Calhoun*, No. 4:15-CV-170-HLM, 2016 WL 361612, at *11 ("[A]lthough the Standing Order attempts to remedy the deficiencies of the earlier bail policy, it simply shortens the amount of time that indigent arrestees are held in jail to forty-eight hours.  As discussed above, however, any detention based solely on financial status or ability to pay is impermissible.") (N.D. Ga. Jan. 28, 2016); *Walker v. City of Calhoun*, No. 4:15-CV-0170-HLM, 2017 WL 2794064, at *3 (N.D. Ga. June 16, 2017) ("[T]he Court rejects Defendant's contention that the Standing Bail Order, as it is presently worded, is constitutional.").

The *Walker* district court never purported to determine, nor did it make any factual findings purporting to determine, whether the way Calhoun implemented its new bail policy complied with the terms of the new policy there.  So like the situation in *Rainwater*, the *Walker* record contained no relevant factual findings for us to grapple with on appeal.  And that is why *Walker* construed the challenge to the new policy there as a facial one only.

But once again, that is not the situation here.  Rather, as I have noted, Hester (on behalf of himself and an uncontested class of "all state-court arrestees who are or who will be jailed in

Cullman County who are unable to pay the secured monetary bail amount required for their release") challenged not only the Standing Bail Order itself but also how Cullman County implemented it. And significantly, following a two-day evidentiary hearing, the district court made factual findings about the County's actual practices, which it found did not comply with the letter of the Standing Bail Order.

So *Walker*, which involved no similar challenge to the City's new policy as implemented and no similar factual findings, provides no basis for the Majority Opinion to wholly dismiss the district court's factual findings here and recast the case as one involving a facial challenge only. Put simply, that *Rainwater* and *Walker*—where the district courts made no factual findings about how the bail system at issue actually operated—resolved their challenges as only facial challenges cannot support the Majority Opinion's decision to rid itself of the factual findings the district court here made about how Cullman County's bail system does actually function and to ignore those facts in its merits analysis.

To sum up, Hester sought to enjoin not only the Standing Bail Order itself but also Cullman County's actual practices under the Standing Bail Order. Then, the district court heard and reviewed evidence about how Cullman County implemented its Standing Bail Order. Ultimately, the district court made factual findings about that and held, based on those factual findings, that Cullman County's actual practices under the Standing Bail Order were unconstitutional. No party alleged on appeal that the district

court's factual findings about Cullman County's uniform practices under the Standing Bail Order were clearly erroneous.

And the district court's factual findings about those practices—that, under the Standing Bail Order, the County continued the practices from its old system that Hester challenged—serve as the basis for why we have jurisdiction under the voluntary-cessation doctrine to consider Hester's case on appeal. But when it comes to the merits, the Majority Opinion—at the same time it relies for jurisdiction on the voluntary-cessation doctrine—sua sponte dismisses the district court's factual findings showing that Cullman County's practices under the old policy continued under the Standing Bail Order. And it does so based on reasons that just don't stand up and precedent that can't support its actions.

I respectfully disagree that we have the option of ignoring the district court's factual findings here. *See Otto v. City of Boca Raton*, ___ 4th ___, No. 19-10604, 2022 WL 2824907, *12 (11th Cir. July 20, 2022) (Jordan, J., dissenting) ("From my perspective, what the panel majority did here—ignoring and/or revising the district court's factual findings and failing to apply the clear error standard—is seemingly becoming habit in this circuit. If this trend continues, the bench and bar will be forgiven for thinking that a district court's factual findings are only inconvenient speed bumps on the road to reversal.") (internal citations omitted). And when we consider those factual findings in our legal analysis, there's no doubt that Cullman County's current bail practices violate the Fourteenth Amendment. Conspicuously, the Majority Opinion does

not assert otherwise; it simply (impermissibly) dismisses those inconvenient factual findings.

## II.    Facts

For that reason, I turn my attention to the relevant facts that the district court found.  But to enable a fuller understanding of those facts, I first discuss the relevant Alabama state bail framework.

> A.    *Alabama entitles all individuals (except those charged with a capital felony or a crime that could turn into a capital felony) to "bail as a matter of right"*

Alabama's Constitution ensures that "all persons shall, before conviction, be bailable by sufficient sureties, except for capital offenses, when the proof is evident or the presumption great . . . ." Ala. Const. art. 1, § 16.  In line with the Alabama Constitution's decree, Alabama statutory law promises that "[i]n all cases other than those specified in subsection (a) of Section 15-13-3,[2] a

---

[2] Like Alabama's Constitution, § 15-13-3(a) exempts from this right those charged with capital offenses and similar offenses that could result in a capital charge:

> (a)  A defendant cannot be admitted to bail when he is charged with an offense which may be punished by death if the court is of the opinion, on the evidence adduced, that he is guilty of the offense in the degree punishable capitally, nor when he is charged with a personal injury to another which is likely to produce death and which was committed under circumstances such as would, if death arises from such injury, constitute an offense which may be punished by death.

18-13894                 ROSENBAUM, J., Dissenting                 19

defendant is, before conviction, entitled to bail as a matter of right." Ala. Code 1975 § 15-13-2.  Similarly, Rule 7.2, Ala. R. Crim. P., provides for every defendant who is charged with an offense that Alabama has deemed "bailable as a matter of right" to be released before trial on his own personal recognizance or on an appearance bond (meaning an unsecured bond) unless the court finds that his release will not reasonably assure his appearance or that his release "will pose a real and present dangers to others or to the public at large."

When it comes to bail conditions, Alabama law defines "personal recognizance" to mean "release without any conditions of an undertaking relating to, or a deposit of, security." Ala. R. Crim. P. 7.1(a).  It defines "appearance bond" as "an undertaking to pay to the clerk of the . . . court . . . a specified sum of money upon the failure of a person released to comply with its conditions." Ala. R. Crim. P. 7.1(b).  In other words, an appearance bond does not require a person released under it to pay anything to be released.  It likewise does not require a person to pay anything ever if he makes all court appearances and otherwise complies with his conditions of release.  Sometimes this type of bond is called an "unsecured bond."

In contrast to an "appearance bond," a "secured appearance bond," sometimes called simply a "secured bond," means "an

---

Ala. Code. 1975 § 15-13-3(a).

20                    ROSENBAUM, J., Dissenting                    18-13894

appearance bond secured by deposit with the clerk of security equal to the full amount thereof." Ala. R. Crim. P. 7.1(c). So a person whose conditions of release include a secured bond must pay money (to the clerk directly or to a third party who then pays money to the clerk) to obtain release.

Alabama law imposes no standard of proof by which an Alabama judicial officer must find that a defendant's release conditions will not reasonably assure his appearance or that the defendant "pose[s] a real and present danger[] to others or to the public at large" if he is released on his own recognizance or on an unsecured bond.

If a defendant cannot pay a scheduled bail amount upon his arrest and must later appear before an Alabama judicial officer for a determination of release conditions and if that officer concludes that a defendant does not qualify for release on his own recognizance or an unsecured bond, "the court may impose the least onerous condition or conditions contained in Rule 7.3(b) that will reasonably assure the defendant's appearance or that will eliminate or minimize the risk of harm . . . ." *Id.* In so doing, the Alabama judicial officer "may take into account" the fourteen considerations set forth at Rule 7.2(a), Ala. R. Crim. P., and repeated in the Majority Opinion at 5–6.

Alabama law defines "indigent" under the Alabama Rules of Criminal Procedure as meaning "a person who is financially unable to pay for his or her defense." Ala. R. Crim. P. R. 6.3. But it states no objective criteria for evaluating whether any given defendant

18-13894               Rosenbaum, J., Dissenting               21

qualifies as "indigent." Rather, the definition of "indigency" is a relative one dependent on the circumstances. In particular, to assess indigency, Alabama law requires the judge to "recognize ability to pay as a variable depending on the nature, extent and liquidity of assets, the disposable net income of the defendant, the nature of the offense, the effort and skill required to gather pertinent information and the length and complexity of the proceedings." Ala. Code 1975 § 15-12-5(b).

> B.     *The district court found that Cullman County's actual bail practices after it adopted the Standing Bail Order imposed two altogether different bail standards on the indigent and nonindigent, resulting in the detention of indigent defendants when similarly situated nonindigent defendants were not detained*

With this general understanding of Alabama law as it governs pretrial release in mind, I turn now to the facts here. Hester alleged he was arrested on July 27, 2017, on a misdemeanor charge of possession of drug paraphernalia and was held on a $1,000 secured bond under Cullman County's pre-Standing Bail Order system. He asserted his bond was set according to the then-existing bail schedule, with no inquiry into his ability to pay or the necessity to detain him.

Four days after his arrest, on August 1, 2017, Hester filed his original intervenor complaint in this case. Sometime before the Standing Bail Order went into effect on March 26, 2018, Hester was released from jail.

After that happened, in April 2018, over two days, the district court held an evidentiary hearing on Hester's motion for a preliminary injunction. During that hearing, the district court heard testimony from four witnesses, including Stephen Demuth, Hester's expert witness in statistical analysis and quantitative research methods, particularly as those methods relate to pretrial detention and release processes; Judge Truman Morrison, a Superior Court judge for the District of Columbia and Hester's expert witness in bail-setting practices; Sheriff Kevin Gentry; and Judge Wells Turner, a district judge for Cullman County. The parties filed nearly sixty exhibits in conjunction with the motion. Among these were the expert reports of Demuth and Judge Morrison; several reports and studies on bail and pretrial detention; the declarations of several individuals who have studied pretrial release; and the declaration of the Vice President of the National Association of Pretrial Services Agencies.

After reviewing the evidence and hearing the witnesses' testimony, the district court made several factual findings about how the post-March 25, 2018, Standing Bail Order system works. As I have mentioned, Hester was released before that system went into effect and did not allege that he was ever subjected to it. But the district court enjoined the County's practices under that system, and the Majority Opinion reviews the Standing Bail Order facially. So I describe the district court's relevant factual findings.

First, I explain how the system works for the nonindigent defendants. Those arrested without a warrant (which includes

18-13894　　　　　ROSENBAUM, J., Dissenting　　　　　23

most people arrested in Cullman County) receive a bail set by the Sheriff, according to a bail schedule that specifies the amount for each crime. Using the same schedule, a magistrate (who generally is neither a member of the Alabama Bar nor a lawyer[3]) presets the bail for those arrested with a warrant. So bail is based on only the charge and the charge alone. Neither the Sheriff nor the magistrate considers the particular facts underlying the charge, the individual's criminal history, past failures to appear, employment status, financial resources, ties to the community, age, health, or any other information. Indeed, Sheriff Gentry conceded that, under the Standing Bail Order, "there's no leeway in . . . what your bond is going to be." The money bail required is also always secured, meaning it must be paid through a surety or a property bond.[4]

　　　　Theoretically, if a law-enforcement officer believes a person poses "an unreasonable risk of flight or danger to the public," then the officer can submit a bail request form to a magistrate requesting that bail be denied until the person is brought before a judge. But in reality, if this happens at all, it happens virtually never. And that

_____

[3] In Cullman County, magistrates are court specialists and perform important functions, but they are not lawyers.

[4] As I have noted, people charged with murder or manslaughter must wait to see a judge at their first appearance before they know if they will receive a bond. Hester's challenge to the Standing Bail Order does not include a challenge to this aspect of the system, so I do not discuss it further. And for that same reason, all references to bail in this dissent's legal analysis deal with cases that do not fall into these limited categories.

24                    Rosenbaum, J., Dissenting                    18-13894

was also the case under the pre-Standing Bail Order system. So while Sheriff Gentry characterized these bail-denial requests as "very few and far between," Judge Turner—one of only two district judges in Cullman County—admitted he had never seen one in conjunction with a warrantless arrest. In other words, before those who can pay the scheduled bail are released, no one makes a danger assessment of any type or an individualized failure-to-appear assessment.

When a person can post bond, his stay in the Cullman County jail generally lasts between forty-five and ninety minutes from when he is booked until when he is released.

Now, I turn to the different Standing Bail Order practices and procedures that govern the experience of a person who cannot post bail. Unlike a person who can pay the scheduled bail and who generally spends, at most, ninety minutes in the Cullman County jail, an indigent person who cannot post bond may wait in jail up to 72 hours before he is brought before a judge for an initial appearance and bond reassessment. That is so because Cullman County holds initial appearances only three times a week—on Monday, Wednesday, and Friday afternoons at about 1:30 or 2:00 p.m. So, for example, a defendant arrested on a Friday after the cutoff for Friday initial appearances will not have his bond hearing until the following Monday afternoon. And even when the indigent defendant has his initial appearance—and unlike those who are not indigent and can simply pay the pre-assigned bail—the indigent defendant is not guaranteed to be released.

At the indigent defendant's initial appearance—and again, unlike for a person who can pay the scheduled bail and does not have a bond hearing—an indigent person like Hester must undergo a danger assessment and an individualized failure-to-appear assessment before his bond is set.  And he might never be able to satisfy the resulting conditions the presiding judge decides to impose.  But an arrestee on the same charge as Hester, for example, who can pay the $1,000 scheduled bail will undergo neither a danger assessment of any type nor an individualized failure-to-appear assessment and will instead be released from jail automatically within ninety minutes of his arrest.

To show the difference even more starkly, while Hester had to sit in jail because he could not afford his bond for misdemeanor possession of drug paraphernalia, Judge Turner confirmed, if a deputy sheriff were to arrest an individual on a charge of first-degree rape, the Sheriff's Office would release the individual—with no danger inquiry or individualized failure-to-appear assessment—as soon as he could post a $20,000 property or surety bond.

Returning to how the judge sets the bond for the indigent defendant at the initial appearance, the judge considers the defendant's written answers to questionnaires that seek information about the defendant's life, family, health, criminal history, employment, and personal finances.   These questionnaires are provided to the defendant before his hearing.

But notably, Judge Turner testified and the district court found that many defendants cannot effectively complete the forms.

As Judge Turner explained, most people arrested in Cullman County do not have a high-school education, many have learning disabilities, and "[a] lot of them" struggle with reading comprehension. So their efforts to respond to the questionnaires are not always helpful.

Compounding these problems, indigent defendants have no counsel present at the bond hearing to assist them. While the judge may appoint counsel during the hearing, the indigent defendant will be unable to meet with that attorney until about a week later.

Meanwhile, at the initial appearance, the judge determines whether to adjust the secured bond that was required by the bail schedule when the defendant was arrested. The Standing Bail Order provides that, in making this determination, the judge "may elicit testimony about the defendant's financial condition." But a form called "Order on Initial Appearance and Bond Hearing" states that the judge must "[give] the Defendant the opportunity to make a statement regarding his/her ability to post the bond currently set in this matter."

After considering the indigent defendant's individualized circumstances, the judge may release the defendant on his own recognizance or with an unsecured bond, or the judge may again impose a secured-bond requirement. If the court requires a secured bond, the Standing Bail Order states that "[t]he Court will make a written finding [on the Order on Initial Appearance and Bond Hearing and the Release Order] as to why the posting of a bond is reasonably necessary to assure the defendant's presence at trial in such a case."

18-13894          ROSENBAUM, J., Dissenting          27

But neither the Order on Initial Appearance and Bond Hearing nor the Release Order provides space for a written finding. Rather, the Order on Initial Appearance and Bond Hearing requires a judge to check boxes next to fifteen listed factors to identify the factors the judge took into "consideration" in requiring a secured bond. Fourteen of the factors come from Rule 7.2(a), Ala. R. Crim. P., and the fifteenth simply says, "Other," which the judge may specify in writing. The Release Order requires only that the judge check a box if the court imposes a secured bond.

Although the Standing Bail Order provides that the court may "require the posting of a secured appearance bond if that is the least onerous condition that will reasonably assure the defendant's appearance or that will eliminate or minimize the risk of harm to others or the public at large," the district court found it is not uncommon for a judge to set a bond at the uncounseled initial appearance in an amount she knows the defendant cannot afford. Indeed, Judge Turner testified that under the Standing Bail Order system, he sets secured bonds for indigent defendants at their initial appearances about half the time. In setting bonds for indigent defendants, Judge Turner does not inquire "much past the defendant's income or indigency status [because he does not] want to get involved with . . . the facts on their case until [he has] appointed them counsel."

If the defendant cannot pay the bond the judge imposes at the initial appearance, typically, up to a month will pass before a judge hears the indigent defendant's counseled motion for bond reduction. That is so because it takes some time for the appointed

attorney to file the motion for bond reduction, and then the court hears those motions only every other Monday. Even if the County does not oppose an indigent defendant's motion for bond reduction, it takes at least 15 days and up to 30 for the district judge to grant the motion. While the indigent defendant's motion remains pending, of course, he sits in jail.

If no initial appearance occurs within 72 hours of the indigent defendant's arrest, though, the Sheriff must release the defendant on an unsecured bond. But that rule does not guarantee an indigent defendant will have an initial appearance and bond reassessment before a judge within 72 hours. Rather, a magistrate may conduct the hearing.

Cullman County asserted that three compelling interests justify the need for secured bonds: (1) providing pretrial release as quickly as possible for all who can afford it; (2) ensuring that defendants appear for court proceedings, and (3) protecting the community from dangerous defendants.

Working backwards, on the County's interest in protecting the public, the district court concluded that data and empirical evidence in the record revealed no significant difference in public-safety rates between defendants released on secured bonds and those given unsecured bonds. Based on these facts, the district court found that the County's stated interest in using secured bail to promote public safety was illusory.

18-13894          Rosenbaum, J., Dissenting          29

As for the County's interest in ensuring the defendant's appearance for court proceedings, given the unrebutted evidence, the court determined that money bail is not more effective than non-monetary conditions of release in reducing the risk of failures to appear. As the district court noted, Dr. Demuth explained that several recent empirical studies comparing the effectiveness of pretrial release conditions found "no difference in the effectiveness of secured and unsecured bonds." For example, the average court-appearance rate for defendants in Jefferson County, Colorado, which was studied, did not differ significantly for defendants whose bond was set by judges who imposed more secured bonds and those who set more unsecured bonds. According to Dr. Michael Jones, one of the study's authors, this finding was consistent with the fact that "both bond types carry the potential for the defendant to lose money for failing to appear."

Besides this, the district court noted that Dr. Jones relied on research studies that show that court date reminders, "which can be delivered through in-person meetings, letters, postcards, live callers, robocalls, text messages, and/or email," are the "single most effective pretrial risk management intervention for reducing failures to appear," improving court appearances by about 30% to 50%. In fact, the district court stated, the public defender in Richmond, California, was able to reduce failure-to-appear rates among its clients from 20% to less than 4% after implementing text-message court-date reminders. And the failure-to-appear rate of low-income defendants in Luzerne County, Pennsylvania, decreased

from 15% to less than 6% when that county started using text-message court-date reminders.

The court also relied on the declaration of Insha Rahman, a senior planner at a nonprofit criminal-justice organization that develops pretrial services. She stated that, in New York City, 95% of nearly 2,300 criminal defendants whose bail was paid by charitable organizations—meaning they had no "skin in the game"—made all their court appearances.

Besides these evidentiary sources, the district court pointed to statements from Judge Morrison's declaration that supported the same conclusion. Judge Morrison attested that, in 2017 (the last full year for which statistics were available when he prepared his declaration), 94% of arrestees in Washington, D.C., were released, and 88% of released defendants "made *all* scheduled appearances during the pretrial period." And, the court observed, Judge Turner effectively agreed that unsecured bail can be effective when he opined that a defendant would have just as much "skin in the game," whether he had unsecured or a secured bond. Another study the court cited, which analyzed data on 153,407 defendants, revealed that when secured bonds result in the extension of a defendant's pretrial detention, secured bonds make it *less* likely that a defendant appears in court.

In response to these many studies and related testimony, Cullman County offered no empirical evidence or research studies to rebut Hester's evidence. Based on the record, then, the district court found that "the plaintiffs' evidence demonstrates that

Cullman County likely would not see an increase in failures to appear with unsecured bonds."

As for the County's interest in securing pretrial release as quickly as possible for all who can afford it, the district court concluded that unsecured bonds for those who cannot afford secured bonds would continue to allow all who can afford secured bonds to be released immediately. But they would also allow those who cannot afford secured bonds to obtain immediate release, while still protecting against failure to appear.

Ultimately, the court concluded that "[n]one of the interests that [the County] identified relating to Cullman[] County's secured bail procedures finds support in the current record." Yet although the district court found, as a matter of fact, that Cullman County's implementation of its Standing Bail Order does not further the County's stated interests for the policy, under that Order, the indigent are still de facto pretrial detained, while the nonindigent are not.

### III.  Unnecessary pretrial detention can significantly harm the defendant, his family, and the community

Before I get into why Cullman County's bail system violates the Fourteenth Amendment, I think it's worth explaining the reasons, including the less obvious ones, why pretrial release is important. Not that pretrial detention is never appropriate. It is—in cases that involve true and serious risks of flight or real threats to

the community (or both) that cannot be mitigated through reasonable non-detaining measures.

But many state-court defendants—including several who are arrested on non-violent misdemeanor offenses—do not present those types of risks. Rather, as the trial court found, based on the evidence, any risks most state-court defendants raise may be suitably addressed by measures short of pretrial detention. And there are important reasons why defendants whose risks can otherwise be addressed should be released unless they are convicted and sentenced to jail or prison time.

More than three decades ago, the Supreme Court declared that "[i]n our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). The fundamental right to pretrial liberty began with the first days of our nation. *See Stack v. Boyle*, 342 U.S. 1, 4 (1951) (explaining that there is a "traditional right to freedom before conviction" going back to the Judiciary Act of 1789). That right is animated by the "bedrock axiomatic and elementary principle whose enforcement lies at the foundation of the administration of our criminal law"—the presumption of innocence. *In re Winship*, 397 U.S. 358, 363 (1970) (quotation marks omitted).

Put simply, before an arrestee is convicted (if he ever is), he is presumed innocent. And we don't punish innocent people with jail time. Yet we have acknowledged the "punitive and heavily burdensome nature" of pretrial detention. *Rainwater*, 572 F.2d at

1056. Because pretrial detention involves the "deprivation of liberty of one who is accused but not convicted of crime," we have recognized that it "present[s] a question having broader effects and constitutional implications than would appear from a rule stated solely for the protection of indigents." *Id.* Among other things, pretrial release "prevent[s] the infliction of punishment prior to conviction." *Id.* at 1056–57.

People who are jailed—even for just a day or two—can lose their jobs, homes, and vehicles; and their bonds with family members, who may be relying on them for support or care, can often be deeply affected. *See Gerstein v. Pugh*, 420 U.S. 103, 114 (1975) ("Pretrial confinement may imperil the suspect's job, interrupt his source of income, and impair his family relationships."); Samuel R. Wiseman, *Pretrial Detention and the Right to Be Monitored*, 123 Yale L.J. 1334, 1356–57 (2014) ("Many detainees lose their jobs even if jailed for a short time, and this deprivation can continue after the detainee's release. Without income, the defendant and his family also may fall behind on payments and lose housing, transportation, and other basic necessities.") (footnotes omitted); Cherise Fanno Burdeen, *The Dangerous Domino Effect of Not Making Bail*, The Atlantic (Apr. 12, 2016), https://www.theatlantic.com/politics/archive/2016/04/the-dangerous-domino-effect-of-not-making-bail/477906/ ("Even short-term incarceration can have dire consequences. People can lose their jobs, housing, even custody of their kids if they're in jail.").

34                    Rosenbaum, J., Dissenting                    18-13894

Jail can also have lasting and irreversible consequences on a person's psychological and physical health.  Some who have been detained when they couldn't pay bail have committed suicide or have otherwise died in custody.  In a tragic example, a teenager in Michigan accused of stealing a bottle of wine committed suicide after spending three days in jail because he could not afford bail.  *See* Ted Roelofs, *The Price of Michigan's Cash Bail System*, The Bridge (Nov. 15, 2016), https://www.bridgemi.com/michigan-government/price-michigans-cash-bail-system.   In another case, Sandra Bland was arrested after failing to signal while changing lanes.  Three days later she was found dead from an apparent suicide in her jail cell.  Abby Ohlheiser & Sarah Larimer, *What We Know About Sandra Bland, Who Died This Week in a Texas Jail*, Washington Post (July 17, 2015), https://www.washingtonpost.com/news/morning-mix/wp/2015/07/17/what-we-know-about-sandra-bland-who-died-this-week-in-a-texas-jail/.

While fortunately not common, sadly, these cases are not flukes, either.  Before the pandemic, roughly 1,000 people died in local jails each year—almost a third by suicide.  Martin Kaste, *The 'Shock of Confinement': The Grim Reality of Suicide in Jail*, NPR (July 27, 2015), https://www.npr.org/2015/07/27/426742309/the-shock-of-confinement-the-grim-reality-of-suicide-in-jail; E. Ann Carson & Mary P. Cowhig, U.S. Dep't of Justice, Bureau of Just. Stat., *Mortality in Local Jails, 2000-2016* (February 2020), https://bjs.ojp.gov/content/pub/pdf/mlj0016st.pdf.  Suicide rates in jails are almost five

18-13894            Rosenbaum, J., Dissenting            35

times higher than they are in prison and three times worse than they are in the general public.

And the COVID-19 pandemic has added problems. Prisons and jails have been hotbeds for the spread of COVID-19, where incarcerated people "have been infected at rates several times higher than those of their surrounding communities." Eddie Burkhalter et al., *Incarcerated and Infected: How the Virus Tore Through the U.S. Prison System*, N.Y. Times (Apr. 10, 2021), https://www.nytimes.com/interactive/2021/04/10/us/covid-prison-outbreak.html.

In fact, the pandemic further exacerbated conditions in Alabama jails because the State halted the transfer of inmates from county jails to state prisons. Ashley Remkus, *Alabama Inmates Sleep on Floors as Jails Overcrowded: 'It's Inhumane'*, AL.com (Dec. 18, 2020), https://www.al.com/news/2020/12/alabama-inmates-sleep-on-floors-as-jails-overcrowd-its-humane.html. As a result, Alabama jails have been overcrowded, leading to shortages in basic supplies and forcing inmates to sleep on mats for weeks at a time. *Id*.

Alabama continued for months to see surges in COVID-19 cases, mainly because of new variants and low vaccination rates. Ramsey Archibald, *New COVID Surge Begins in Alabama, Hospitalizations Double in July, Positivity Rate Climbing*, AL.com (July 20, 2021), https://www.al.com/news/2021/07/new-covid-surge-begins-in-alabama-hospitalizations-double-in-july-positivity-rate-

36                    ROSENBAUM, J., Dissenting                    18-13894

climbing.html.  Three days of pretrial incarceration during the cur-
rent pandemic could have life-altering consequences.

That's not all.  Individuals detained pretrial are also more
likely to be convicted or plead guilty—even if they are not guilty.
The district court found, based on empirical evidence and studies,
that pretrial detention boosts the likelihood that an arrestee is con-
victed.  For example, the court relied on a Harris County, Texas,
study that concluded that "defendants who are detained on a mis-
demeanor charge are much more likely than similarly situated [de-
fendants who are released pretrial] to plead guilty and serve jail
time.  Compared to similarly situated [released defendants], de-
tained defendants are 25% more likely to be convicted . . . ."  And
it pointed to a study from Pittsburgh that found that "pretrial de-
tention leads to a 13% increase in the likelihood of being convicted,
an effect largely explained by an increase in guilty pleas among de-
fendants who otherwise would have been acquitted or had their
charges dropped."  The district court also relied on "data from New
York City [that] shows that 92% of people detained pretrial pleaded
guilty, while only 24% and 32% of the cases in which the defend-
ant's bail was paid by the Bronx Freedom and Brooklyn Commu-
nity Bail Fund, respectively, resulted in a criminal conviction."

Those findings are unsurprising given that pretrial release
"permits the unhampered preparation of a defense" and gives ar-
restees better bargaining positions for plea deals.  *Stack*, 342 U.S. at
4.  Conversely, those who are detained often feel added pressure to
plead guilty:  each additional hour in jail ratchets up the pressure

to cut a deal to get out as quickly as possible. Wiseman, *Pretrial Detention*, at 1356 ("In some cases, the periods that defendants spend in jail awaiting trial is comparable to, or even greater than, their potential sentences, thus substantially incentivizing quick plea deals regardless of guilt or innocence.") (footnotes omitted).

The pressure to plead out is even greater for those (like Hester) accused of misdemeanors. For them, "the worst punishment may come before conviction" because misdemeanor defendants are routinely given "'time served' or probation," so misdemeanor arrestees are incentivized to plead guilty and get out of jail as soon as possible. Paul Heaton *et al.*, *The Downstream Consequences of Misdemeanor Pretrial Detention*, 69 Stan. L. Rev. 711, 715 (2017) (footnotes omitted).[5] The research backs this up: A study on misdemeanor defendants in Harris County, Texas, found that defendants who were detained pretrial were 25% more likely to plead guilty than non-detained defendants. *Id.* at 717, 747.

Plus, the district court here concluded that "pretrial detention is associated with harsher sentences upon conviction." It cited the Harris County, Texas, study as finding that "detained individuals were 43% more likely than similarly situated released individuals to be sentenced to a term of incarceration." And the court similarly pointed to the conclusion of a study of Philadelphia's pretrial

---

[5] Hester submitted this article as empirical evidence during the preliminary injunction hearing. See ECF No. 129-19.

procedures that "defendants detained pretrial generally end up owing $129 more in non-bail court fees and are sentenced to an additional 124 days [in jail] on average upon conviction."

These costs do not rest solely on the arrestee's shoulders; society also pays for them. In a literal sense, taxpayers pay exponentially more to detain individuals pretrial than it would if the detainees were released pretrial. For example, studies have found that detaining an arrestee costs $80 to $150 per day, "while monitoring a defendant released pretrial costs between $5 and $15 a day." Nicole Hong and Shibani Mahtani, *Cash Bail, a Cornerstone of the Criminal-Justice System, is Under Threat*, Wall Street Journal (May 22, 2017). So we should make sure that those we detain really do need to be detained.

But it is not just our pocketbooks that unnecessary pretrial detention hurts; the district court cited a study showing those who are detained pretrial are more likely to commit a crime in the future. And other studies reach the same conclusion. *See, e.g.*, Heaton et al., *Downstream Consequences*, at 718; *see also* ECF No. 129-12 at 5 (a study of detainees in Kentucky found that individuals who were detained for 2 or 3 days were 1.39 times more likely to engage in new criminal activity than those who were released within a day).

In short, the district court found that unnecessary pretrial detention has both deep and rippling consequences—for the defendant, his family, and the community.

18-13894            ROSENBAUM, J., Dissenting            39

## IV.  The district court correctly determined that Cullman County's actual bail practices violate the Fourteenth Amendment

Hester argues that Cullman County subjects indigent state-court defendants to effective pretrial detention when it releases similarly situated nonindigent defendants.  In other words, Hester contends Cullman County detains indigent defendants just because they are indigent.  And that, he asserts, violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment.  I agree.

The Supreme Court has long recognized that "there can be no equal justice where the kind of trial a man gets depends on the amount of money he has." *Bearden v. Georgia*, 461 U.S. 660, 664 (1983) (quoting *Griffin v. Illinois*, 351 U.S. 12, 19 (1956) (plurality opinion)).  And our predecessor Court has acknowledged "that imprisonment solely because of indigent status is invidious discrimination and not constitutionally permissible." *Rainwater*, 572 F.2d at 1056.

Due-process and equal-protection concerns animate this principle of "equal justice." *See Bearden*, 461 U.S. at 664–65.  As the Court has explained, we consider "whether the State has invidiously denied one class of defendants a substantial benefit available to another class of defendants under the Equal Protection Clause." *Id.* at 665.  And we also evaluate "the fairness of relations between the criminal defendant and the State under the Due Process Clause." *Id.*

If a defendant is detained just because of his indigent status and without "a meaningful opportunity to enjoy" pretrial release, we apply heightened scrutiny in reviewing the scheme. *Walker v. City of Calhoun*, 901 F.3d 1245, 1261 (11th Cir. 2018) (quoting *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 20 (1973)). Indeed, our predecessor Court has explained that "[t]he demands of equal protection of the laws and of due process prohibit depriving pre-trial detainees of the rights of other citizens to a greater extent than necessary to assure appearance at trial and security of the jail." *Rainwater*, 572 F.2d at 1057 (citation and quotation marks omitted).

*Rainwater*'s use of the phrase "to a greater extent than necessary" reflects heightened scrutiny, as rational-basis scrutiny would uphold a scheme as long as it is "rationally related to a legitimate government purpose," *Leib v. Hillsborough Cnty. Pub. Transp. Comm'n*, 558 F.3d 1301, 1306 (11th Cir. 2009)—no matter if the scheme deprives pretrial detainees of the rights of other citizens more than necessary to achieve the government's legitimate interests. *Rainwater*'s use of heightened scrutiny follows Supreme Court precedent in cases involving the state's use of wealth-based incarceration. In *Bearden*, for example, the Court held that a state can imprison an indigent probationer "[o]nly if the sentencing court determines that alternatives to imprisonment are not adequate" to meet the state's interest. 461 U.S. at 672. In other words, jailing must be the only adequate option—not just a rational one.

18-13894          ROSENBAUM, J., Dissenting          41

A.    Rainwater *requires the conclusion that Cullman County's bail system violates the Fourteenth Amendment*

In *ODonnell v. Harris County*, 892 F.3d 147 (5th Cir. 2018), *abrogated by Daves v. Dallas Cnty.*, 22 F.4th 522 (5th Cir. 2022) (en banc), the Fifth Circuit applied these principles—and *Rainwater* in particular—in evaluating a Fourteenth Amendment challenge to the bail system of Harris County, Texas.

Before addressing *ODonnell's* analysis of the Fourteenth Amendment issues at stake here, I pause to explain the status of *ODonnell*. *ODonnell* involved a challenge to Harris County, Texas's actual bail practices in connection with a bail schedule. As I explain below, the Fifth Circuit concluded that Harris County's bail practices violated the Fourteenth Amendment. Separately, in *Daves v. Dallas County*, 22 F.4th 522, another group of plaintiffs challenged Dallas County's bail practices, which were allegedly similar to the bail practices of Harris County in *ODonnell*. The district court and a panel of the Fifth Circuit therefore applied *ODonnell's* substantive analysis to whether Dallas County's bail practices violated the Fourteenth Amendment and found that they did. *See id.* at 530–31.

The Fifth Circuit then took *Daves* en banc solely on issues of justiciability. *See id.* at 528. And while the Fifth Circuit vacated the district court and panel decisions in *Daves* in their entirety because it concluded, in part, that the plaintiffs lacked standing to sue some defendants in *Daves* (similar defendants are not enjoined in

42                    ROSENBAUM, J., Dissenting                    18-13894

Hester's case) and it directed the district court to address absten-tion, it was careful to note that its decision did "not reach the mer-its." *Id.*

As the panel decision in *Daves* was vacated because the Fifth Circuit concluded it did not suitably address justiciability concerns, and it, in turn, was based on *ODonnell* and its similar treatment of justiciability concerns, *ODonnell* is no longer good law in the Fifth Circuit. But as I've mentioned, the Fifth Circuit's en banc decision in *Daves* did not reach or criticize *ODonnell*'s merits analysis in any way. And the four Fifth Circuit judges who dissented from the *Daves* justiciability-based en banc decision and who did comment on the *ODonnell* merits analysis reaffirmed it. *See id.* at 551–52 (Haynes, J., dissenting); *cf. also id.* at 570 ("The bail system at issue in this case blatantly violates arrestees' constitutional rights.").

So while *ODonnell* is no longer good law, its Fourteenth Amendment analysis remains instructive. And that is especially so because that analysis is based on our mutually binding precedent in the form of *Rainwater*, since like we are, the Fifth Circuit is bound by *Rainwater*.[6] I therefore review *ODonnell*.

---

[6] *Rainwater* is a Fifth Circuit precedent from 1978. Because it is Fifth Circuit precedent, it binds the Fifth Circuit. It also binds us because the Fifth Circuit issued it before October 1, 1981, and we have adopted as precedential all such Fifth Circuit opinions. *See Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

The *ODonnell* district court found that, under Harris County's bail system as it was implemented, all misdemeanor arrestees had hearings where bail amounts were set. *See ODonnell*, 892 F.3d at 153–54. But these hearings, in practice, "did not achieve any individualized assessment in setting bail." *Id.* at 153. At the hearings, bail amounts were set in accordance with a bail schedule and on a secured basis most of the time, and hearing officers knew that, by imposing a secured bail on indigent arrestees, they were ensuring that those arrestees would remain detained. *Id.* at 154. Yet (as here) the evidence before the court reflected that "release on secured financial conditions does not assure better rates of appearance or of law-abiding conduct before trial compared to release on unsecured bonds or nonfinancial conditions of supervision." *Id.* In sum, the district court concluded that Harris County's bail "custom and practice resulted in detainment solely due to a person's indigency because the financial conditions for release are based on predetermined amounts beyond a person's ability to pay and without any 'meaningful consideration of other possible alternatives.'" *Id.* at 161.

In conducting its analysis on appeal, on the due-process side of the equation, the Fifth Circuit observed that the Texas Constitution provided that "[a]ll prisoners shall be bailable by sufficient sureties." *Id.* at 158 (quoting Tex. Const. art. 1, § 11). Based on that, the Fifth Circuit concluded that "Texas state law creates a right to bail that appropriately weighs the detainees' interest in pretrial release and the court's interest in securing the detainee's

attendance." *Id.* That right, in turn, means that judicial officers cannot "impose a secured bail solely for the purpose of detaining the accused." *Id.* Rather, decisions on conditions of release must "reflect a careful weighing of the individualized factors" Texas law set forth. *Id.* As the Fifth Circuit explained, this right was a state-created liberty interest. *See id.*

After hashing this out, the Fifth Circuit turned its attention to evaluating whether Harris County's bail practices adequately protected the arrestees' right to such a bail. To conduct this analysis, the Fifth Circuit employed the *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), three-part balancing test that considers "the private interest . . . affected by the official action; the risk of an erroneous deprivation of such interest through the procedure used, and the probable value, if any, of additional or substitute procedural safeguards; and the Government's interest, including the function involved and the fiscal and administrative burdens that new procedures would impose." *ODonnell*, 892 F.3d at 158–59 (citation and quotation marks omitted).

After weighing these interests, the Fifth Circuit determined that Harris County's bail practices were "inadequate" "when applied to . . . the liberty interest at stake." *Id.* at 159. In particular, the court noted that the district court's factual findings showed that "secured bail orders [we]re imposed almost automatically on indigent arrestees," even though officials knew the indigent could not afford such bail. *Id.* Based on this fact, the court concluded, Harris

County's bail practices did "not sufficiently protect detainees from [officials] imposing bail as an 'instrument of oppression.'" *Id.*

That said, the court declined to require factfinders to issue a written statement of their reasons for the selected pretrial release conditions. *Id.* at 160. As the court explained, the arrestees' liberty interest—"the right to pretrial liberty of those accused (that is, presumed innocent) of misdemeanor crimes upon the court's receipt of reasonable assurance of their return"—was "particularly important." *Id.* at 159. But so was "the government's interest in efficiency." *Id.* And the court was concerned that requiring Harris County to produce 50,000 written opinions per year would impose too great a burden. *Id.* at 160. Rather, it reasoned, requiring officials "to specifically enunciate their individualized, case-specific reasons" for imposing release conditions they knew indigent individuals could not meet was "a sufficient remedy." *Id.*

The Fifth Circuit also determined that "the federal due process right" as recognized in *County of Riverside v. McLaughlin*, 500 U.S. 44, 56–58 (1991), "entitles detainees to a [bond] hearing within 48 hours." *ODonnell*, 892 F.3d at 160.

Then the Fifth Circuit considered the equal-protection part of the challenge to Harris County's bail practices. It determined that those practices warranted heightened-scrutiny review under *Rodriguez. Id.* at 162; *see also Daves*, 22 F.4th at 552 (Haynes, J., dissenting) ("We determined that the district court did not err in applying intermediate scrutiny."). That is, under Harris County's bail practices, indigent arrestees could not pay secured bail, "and,

46                    ROSENBAUM, J., Dissenting                    18-13894

as a result, sustain[ed] an absolute deprivation of their most basic liberty interests—freedom from incarceration." *ODonnell*, 892 F.3d at 162. And, the court continued, indigent arrestees were "incarcerated where similarly situated wealthy arrestees [we]re not, solely because the indigent cannot afford to pay a secured bond." *Id*. And, invoking *Rainwater*, 572 F.2d at 1057, the *ODonnell* Court noted that the district court's factual findings showing that Harris County's bail practices resulted in wealth-based detainment "without any 'meaningful consideration of other possible alternatives'" meant that Harris County's bail practices were unconstitutional. *ODonnell*, 892 F.3d at 161 (quoting *Rainwater*, 572 F.2d at 1057).

The Fifth Circuit concluded that Harris County's bail practices flunked heightened scrutiny. *Id.* at 162. It acknowledged that the County enjoyed a "compelling interest in the assurance of a misdemeanor detainee's future appearance and lawful behavior." *Id.* But the court held that Harris County's bail practices were "not narrowly tailored to meet that interest." *Id.* In support of this conclusion, the Fifth Circuit explained that Harris County did not show a "link between financial conditions of release and appearance at trial or law-abiding behavior before trial." *Id.* Indeed, the County did not present data showing that secured bail was more effective than unsecured bail in ensuring an arrestee's future appearance. *Id.* But meanwhile, the plaintiffs submitted data suggesting that using secured bail might increase the likelihood of unlawful behavior. *Id.*

18-13894          Rosenbaum, J., Dissenting          47

At the end of the day, the Fifth Circuit explained, under Harris County's bail practices, "two misdemeanor arrestees who are identical in every way—same charge, same criminal backgrounds, same circumstances, etc.—except that one is wealthy and one is indigent," "would almost certainly receive identical secured bail amounts." *Id.* at 163. The wealthy arrestee could post bond, while the indigent one would not. *Id.* And as a result, "the wealthy arrestee [would be] less likely to plead guilty, more likely to receive a shorter sentence or be acquitted, and less likely to bear the social costs of incarceration." *Id.* Meanwhile, the indigent arrestee would not enjoy those same advantages. *Id.* The Fifth Circuit concluded that, under *Rainwater* and Supreme Court precedent, this violated the Equal Protection Clause of the Fourteenth Amendment. *Id.*

Hester's case presents the same problems as *ODonnell*. I begin with the due-process analysis.

First, the liberty interest: there is no meaningful distinction between Texas's constitutional promise that "[a]ll prisoners shall be bailable by sufficient sureties," Tex. Const. art. 1, § 11, and Alabama's constitutional guarantee that "all persons shall, before conviction, be bailable by sufficient sureties, except for capital offenses, when the proof is evident or the presumption great . . . ." Ala. Const. art. 1, § 16. And Alabama courts "have consistently construed" the Alabama Constitution and § 15-13-2, Code of Alabama 1975, "as ensuring to an accused an absolute right to bail." *Shabazz v. State*, 440 So. 2d 1200, 1201 (Ala. Crim. App. 1983) (citing

48                     ROSENBAUM, J., Dissenting                    18-13894

*Brakefield v. State*, 113 So. 2d 669 (Ala. 1959); *Holman v. Williams*, 53 So. 2d 751 (Ala. 1951); *Sprinkle v. State*, 368 So. 2d 554 (Ala. Crim. App. 1978)). So those arrested in Alabama must enjoy the same liberty interest under the Alabama Constitution that Texas's Constitution created in "a right to bail that appropriately weighs the detainees' interest in pretrial release and the court's interest in securing the detainee's attendance," *ODonnell*, 892 F.3d at 158.

As for the *Mathews* balancing test, as in the factual findings in *ODonnell*—where the district court determined that "secured bail orders [we]re imposed almost automatically on indigent arrestees," *id.* at 159, even though officials knew the indigent could not afford such bail—the district court here found that "Cullman County mechanically applies a secured money bail schedule to detain the poor and release the wealthy," and "[i]t is not uncommon for a judge to set a bond in an amount he knows the defendant cannot afford." Just as these circumstances in *ODonnell* led the Fifth Circuit to conclude that Harris County's actual bail practices (rather than its written bail framework) did "not sufficiently protect detainees from [officials] imposing bail as an 'instrument of oppression,'" *id.*, the district court here found that "Cullman County's actual procedures are significantly less individualized and protective than due process requires."

In further support of this conclusion, the district court here noted other deficiencies in Cullman County's practices, including that Cullman County "do[es] not provide constitutionally adequate notice to indigent criminal defendants before an initial

18-13894          Rosenbaum, J., Dissenting          49

appearance"; that judges "do[] not have to give a criminal defendant an opportunity to be heard or present evidence"; that "neither the Cullman County Sheriff nor a Cullman County judge must satisfy an evidentiary standard before entering an unaffordable secured bond that serves as a *de facto* detention order"; and that judges "do not actually make 'findings'" when they require a bond to be posted.

As for notice—which relates directly to the opportunity to be heard—the district court explained that the only evidence of notice in the record was the notice statement in the Release Questionnaire. As for that statement—"FOR THE PURPOSE OF DETERMINING CONDITIONS OF PRE-TRIAL RELEASE IN THIS CASE, THE COURT MAY TAKE INTO ACCOUNT THE FOLLOWING,"—the district court found it "does not communicate the most crucial piece of information, namely, that a judge may enter a *de facto* detention order by setting unaffordable secured money bail even after considering the information provided by the defendant." The district court also noted that Judge Turner testified that he does not inform criminal defendants of the fourteen factors he uses to set secured bail, so a defendant may not know what information may be important to share at the hearing. Not only that, but the form is only offered to arrestees, and some don't take it. Plus, the district court found that many arrestees cannot read or write, rendering the information on the Questionnaire "tantamount to no notice at all."

Even Judge Turner admitted that he had "no idea" whether arrestees were ever advised of the fourteen factors that are supposed to be considered to determine arrestees' release conditions. But the Supreme Court has explained that "[t]he opportunity to be heard must be tailored to the capacities and circumstances of those who are to be heard." *Goldberg v. Kelly*, 397 U.S. 254, 268 (1970). And "at a minimum, the Due Process Clause requires notice and the opportunity to be heard incident to the deprivation of . . . liberty . . . at the hands of the government." *Grayden v. Rhodes*, 345 F.3d 1225, 1232 (11th Cir. 2003).

As for the lack of an opportunity to be heard, the district court found that Cullman County "impermissibly leave[s] a criminal defendant's opportunity to be heard, a 'fundamental requirement of due process,' up to the judge's discretion." (quoting *Mathews*, 424 U.S. at 333). And the district court also observed that the Standing Bail Order likewise does not require the judge to give the defendant the chance to present evidence.

Turning to the lack of an evidentiary standard, the district court noted that the Standing Bail Order did not identify any standard of proof by which the factfinder must find the defendant to be a failure-to-appear or danger risk.

And on the lack of factual findings, the district court found that "Cullman County judges do not actually make 'findings.'" Rather, they "merely check[] a box for any of fourteen factors [they] 'considered.'" So, for example, a judge might simply check the box next to "age, background and family ties, relationships and

18-13894          ROSENBAUM, J., Dissenting          51

circumstances of the defendant" without explaining what he learned or how it influenced his decision. Comparing that to the *ODonnell* hearing officers' insufficient "jotting [of] abbreviated factors such as 'safety' or 'criminal history,'" the district judge found Cullman County's practice to be "just as inadequate."

The problem with this practice, the district judge explained, arises most significantly when "an indigent defendant finally obtains the assistance of appointed counsel [to move for reconsideration of a bond], but the record affords appointed counsel no information regarding the rationale for her client's bond, making the task of identifying error and challenging the bail amount unreasonably—and potentially insurmountably—difficult." As the district court cogently reasoned, "Checking boxes for factors 'considered' is tantamount to providing counsel with a copy of Rule 7.2(a) of the Alabama Rules of Criminal Procedure; checkboxes for factors 'considered' provide no meaningful information to indigent defendants or their appointed counsel." To correct these problems, the district court required judges to state on the record their reasons for determining that a secured money bond above a defendant's financial means was necessary to ensure the defendant's appearance at trial or protect the community.

Compounding all these deficiencies, the district court found, was the lack of counsel at the bail hearing. As the court explained, most of these other deficiencies could be addressed by having counsel present to ensure the defendant understood the purpose of

the proceeding and the court provided the other requisite procedural protections.

But the first opportunity for counsel's involvement in the bail process for indigent defendants does not occur until the appointed attorney files a motion for reconsideration of bail and the court hears the motion—a process that generally takes up to a month or more. In other words, an indigent defendant can sit in jail for up to a month or more—a month!—before he receives his first meaningful opportunity to be heard. To be clear, that's a month in jail—without conviction—before the indigent defendant even has his first meaningful opportunity to be heard on bail. That's a long time for someone who is presumed innocent. Yet "[t]he fundamental requisite of due process of law is the opportunity to be heard . . . at a meaningful time and in a meaningful manner." *Goldberg*, 397 U.S. at 267 (cleaned up).

In sum, the district court found in Cullman County's bail practices the same process deficiencies the Fifth Circuit found in Harris County's bail practices in *ODonnell*. For the same reasons the Fifth Circuit concluded Harris County's bail practices violated the due-process rights of indigent arrestees, then, Cullman County's bail practices do.

Moving to the equal-protection analysis, first, just as Harris County's bail practices in *ODonnell* did, Cullman County's bail practices trigger heightened scrutiny under *Rodriguez*. In Cullman County, as in Harris County, indigent arrestees are absolutely

deprived of pretrial release just because they are too poor to pay for it. We know this for at least two reasons.

First, the district court found that the Standing Bail Order "does nothing to secure public safety." That finding is not clearly erroneous. In fact, the Standing Bail Order itself favorably cites precedent for the proposition that "[t]he bond schedule represents an assessment of what bail amount would ensure the appearance of the average defendant facing such a charge and is therefore aimed at assuring the presence of a defendant." Standing Bail Order at 2 (cleaned up). Judge Turner similarly characterized the purpose of the secured-bail schedule as being "[t]o secure the return of the defendant, to meet their court dates."

And although the Standing Bail Order calls for bail request forms to seek release conditions other than the scheduled bail for nonindigent defendants when danger or failure-to-appear risk exists, the district court also found that the Sheriff just about never uses them in warrantless arrests. That means Cullman County makes no inquiry into risk of danger before releasing nonindigent defendants arrested without a warrant. Meanwhile, Cullman County requires all indigent defendants to undergo a danger assessment and then imposes bond based on that. So two similarly situated arrestees with the same arrest offense, the same criminal history, and the same offense circumstances—but one of whom is indigent and the other not—will have two different pretrial-release statuses. The indigent defendant will remain in jail pretrial on a secured bond set too high for the defendant to afford, but the

nonindigent defendant who represents the same safety risk will stay in jail for no more than about ninety minutes after his arrest. And since the only difference between these two defendants is that one is indigent and the other isn't, it's clear that any alleged danger risk is not driving the difference in release status. Rather, as far as risk of danger is concerned, the indigent defendant is, in fact, incarcerated just because of his indigence.

Second, Cullman County asserts that its bail schedule is meant to address risk of flight, and since the indigent by definition can't pay their scheduled bail, their bail hearings and resulting bail or other release requirements are intended to take the place of the scheduled bail amounts. But Cullman County's bail-schedule procedure makes no individualized inquiry into failure-to-appear risk that nonindigent arrestees might present. And the County could identify no empirical evidence showing that the scheduled secured bail amounts in fact reasonably ensure nonindigent defendants' appearances or if they do so, that they do so more than unsecured bonds would.

In this respect, the district court favorably cited "several recent empirical studies that compare the effectiveness of different kinds of bonds in assuring appearance in court . . . [and] [found] no difference in the effectiveness of secured and unsecured bonds." (quotation marks omitted) (first bracketed alteration added). As the district court noted, one study found that "regardless of a criminal defendant's pretrial risk category, unsecured bonds offer decision-makers the same likelihood of court appearance as do secured

18-13894            Rosenbaum, J., Dissenting            55

bonds." (internal quotation marks omitted).  In fact, the district court found that "secured money bail actually may undermine the government's interest in court appearance because money bail results in longer periods of pretrial detention for those who cannot easily afford bail, which, in turn, is associated with higher failure to appear rates."  And as the district court found, even Judge Turner "acknowledged that an individual would have just as much 'skin in the game' with an unsecured bond [as with a secured bond]."

No one argues that the district court's factual finding that unsecured bond is at least as effective as secured bond in ensuring a defendant's presence for court proceedings is clearly erroneous. Nor, on this record, could they succeed in such an argument.  So we must accept this factual finding.  Because unsecured bond would reasonably ensure a defendant's presence as much as secured bond, the imposition of secured bonds on the indigent functions solely to keep indigent defendants detained.

Overall, under Cullman County's bail practices, just like under Harris County's bail practices, indigent arrestees cannot pay secured bail, "and, as a result, sustain an absolute deprivation of their most basic liberty interests—freedom from incarceration." *See ODonnell*, 892 F.3d at 162.  And they are "incarcerated where similarly situated wealthy arrestees are not, solely because the indigent cannot afford to pay a secured bond." *See id.*  Also as in *ODonnell*, as the due-process analysis here shows, because of their indigency, Cullman County indigent defendants do not receive a meaningful opportunity to enjoy pretrial release.

For these reasons, again, as in *ODonnell*, heightened scrutiny applies when we perform an equal-protection analysis of Cullman County's bail practices. Cullman County's bail practices fare no better than did Harris County's.

There's no question that Cullman County has legitimate interests in its stated concerns for minimizing the risks of failure to appear and danger to the community. But for the reasons the district court found and I've just described, Cullman County's bail practices, like Harris County's in *ODonnell*, are "not narrowly tailored to meet th[ose] interest[s]." *Id.* Again echoing Harris County's situation in *ODonnell*, Cullman County did not establish a "link between financial conditions of release and appearance at trial or law-abiding behavior before trial." *See id.* Nor (like Harris County in *ODonnell*) did Cullman County submit data showing that secured bail was more effective than unsecured bail in ensuring an arrestee's future appearance. *See id.* But like the *ODonnell* plaintiffs, Hester and the putative class did present data indicating that using secured bail might increase the likelihood of unlawful behavior. *Id.*

As for Cullman County's claimed interest in "providing pretrial release as quickly as possible for all who can afford it," part of Cullman County's equal-protection problem stems from this very mindset. While it is admirable that Cullman County seeks to provide speedy release, its legitimate interest relating to this concern must follow its legitimate interests in minimizing the risks of failure to appear and danger to the community. Or releasing those who

18-13894          Rosenbaum, J., Dissenting          57

can afford bail, without considering whether their scheduled secured bail minimizes failure-to-appear and danger risks, could easily work at cross-purposes with those stated interests. And so Cullman County's third interest more specifically lies in providing pretrial release as quickly as possible for all whose failure-to-appear and danger risks can be reasonably minimized through adequate release conditions—no matter if that is by secured money bond or other conditions. But as I've explained, Cullman County's bail practices are not narrowly tailored to further that interest.

Given these facts, it is no surprise that the district court found that "Cullman County's stated interests [justifying its use of secured bonds] are illusory and conspicuously arbitrary." In fact, it concluded that "[n]one of the interests that the defendants have identified relating to Cullman County's secured bail procedures finds support in the current record."

So at bottom—and again, as in *ODonnell*—under Cullman County's bail practices, "two misdemeanor arrestees who are identical in every way—same charge, same criminal backgrounds, same circumstances, etc.—except that one is wealthy and one is indigent," "would almost certainly receive identical secured bail amounts." *See id.* at 163. The wealthy arrestee could post bond, while the indigent one would not. *See id.* And as a result, "the wealthy arrestee [would be] less likely to plead guilty, more likely to receive a shorter sentence or be acquitted, and less likely to bear the social costs of incarceration." *See id.* Meanwhile, the indigent arrestee would not enjoy those same advantages. *See id.* Like the

58                    ROSENBAUM, J., Dissenting                    18-13894

Fifth Circuit, I conclude that, under *Rainwater* and Supreme Court precedent, this violates the Equal Protection Clause of the Fourteenth Amendment. *Id.*

> B.      *Contrary to the Majority Opinion's conclusion, our caselaw does not "amply support[] the conclusion that Cullman County's bail scheme does not unconstitutionally discriminate against the indigent," Maj. Op. at 46*

The Majority Opinion reaches the opposite determination, holding that "[o]ur caselaw amply supports the conclusion that Cullman County's bail scheme does not unconstitutionally discriminate against the indigent."  Maj. Op. at 46.  The Majority Opinion relies specifically on *Rainwater* and *Walker*.  *See* Maj. Op. at 46–61.  Neither helps the Majority Opinion's case.

I begin with *Rainwater*.  To be sure, the general legal principles *Rainwater* articulates do govern our analysis here.  As we said in *Walker*, "[t]he *sine qua non* of a *Bearden*- or *Rainwater*-style claim . . . is that the State is treating the indigent and the non-indigent category differently.  Only someone who can show that the indigent are being treated systematically worse solely because of [their] lack of financial resources—and not for some legitimate State interest—will be able to make out such a claim."  901 F.3d at 1260 (internal citation and quotation marks omitted).  As I've explained in Section IV.A. of this dissent, Hester and the putative class can show that they satisfy this test, so *Rainwater*'s legal principle

requires the conclusion that Cullman County's bail practices violate the Fourteenth Amendment.

But the Majority Opinion's efforts to avoid this conclusion by shoehorning the facts of Hester's case into the pattern of the facts in *Rainwater* to conclude that Cullman County's bail practices are like Florida's rule and are therefore constitutional are another story. The problem is that shoe is too small for Hester's facts to fit.

In *Rainwater*, as I've discussed, the former Fifth Circuit considered only a facial challenge to Florida's then-new rule establishing the pretrial bail system. 572 F.2d at 1055. Florida's bail system's sole purpose was "to reasonably assure defendant's presence at trial." *Id.* at 1057. It did not purport to seek to minimize danger to the community. *See id.* at 1055 n.2. And Florida's rule required the court to impose simply what was "necessary to assure the defendant's appearance." *See id.*; *see also id.* at 1058.

Hester's case is distinguishable for a few reasons. First, as I have discussed in Section I, unlike the facial challenge at issue in *Rainwater*, Hester's case is based on Cullman County's actual bail practices; it is not solely a facial challenge to the Standing Bail Order. So unlike in *Rainwater*, we must consider the district court's factual findings about Cullman County's actual bail practices; it is not enough to look simply and solely at the Standing Bail Order.

Second, unlike Florida's rule, Cullman County asserts as a justification for bail an interest in reasonably ensuring that the defendant will not present a risk of danger to the community or

himself.  Yet when we look at Cullman County's actual bail prac-tices, we find that Cullman County does not, in fact, account for this interest when it comes to nonindigent defendants.  As I have noted, the bail schedule does not purport to be directed at reason-ably ensuring that a defendant is not a danger.  And the district court found that Cullman County pretty much never uses its bail-request-form tool to seek for nonindigent defendants release con-ditions or restrictions geared towards Cullman County's claimed interest in reasonably ensuring the safety of the public.

The Majority Opinion ignores this factual finding without finding it clearly erroneous and instead concludes, contrary to the record, that Cullman County "do[es] account for the danger factor in that law enforcement is expected to file a 'Bail Request Form' to avoid the release of any arrestee who might be a danger to the pub-lic."  Maj. Op. at 56 n.7.  Only by failing to reckon with Cullman County's actual bail practices, as found by the district court, is the Majority Opinion able to conclude that Cullman County "place[s] all arrestees on equal footing [because] all are released as soon as they are able to show that they are not a flight risk or danger to the community."  Maj. Op. at 56.  Because that conclusion requires us to impermissibly ignore the district court's factual findings that nonindigent defendants are never assessed for danger, it cannot bring Hester's case within the factual pattern on which *Rainwater* was decided.

Third, unlike in the facial challenge in *Rainwater*, here, the district court made factual findings that "secured money bail is not

more effective than unsecured bail or non-monetary conditions of release in reducing the risk of flight from prosecution" and that "unsecured bonds offer decision-makers the same likelihood of court appearance as do secured bonds." It also found that "secured bail is not necessary to secure a criminal defendant's appearance."

The Majority Opinion has not determined those findings to be clearly erroneous. So on this record, a secured bond cannot be the least onerous way of reasonably ensuring the defendant's appearance. Yet Judge Turner testified that under the Standing Bail Order system, he sets secured bonds for indigent defendants at their initial appearances about half the time. And the district court found that "[i]t is not uncommon for a judge to set a bond in an amount he knows the defendant cannot afford." In other words, as a practice, Cullman County sets indigent defendants' bonds in secured amounts it knows they cannot pay, thereby keeping them in jail pretrial, even though that is unnecessary to reasonably ensure their appearances in court.

But in *Rainwater*, where we looked to only the bail rule at issue there (not to actual court practices), we assumed the judges' compliance with the language of the rule, requiring judges not to impose any more bail than was "necessary" to secure the defendants' appearances there. For that reason, we found the rule did not violate Fourteenth Amendment concerns. Because the factual findings here show that the district court imposes secured bonds that indigent defendants cannot afford when such bonds are unnecessary to obtain their appearances in court, *Rainwater*'s conclusion

62                   ROSENBAUM, J., Dissenting                   18-13894

that the Florida rule did not violate the Fourteenth Amendment does not determine the outcome here. The district court's factual finding in this respect further shows, on the appearance-risk assessment, that Cullman County's bail practices do not "place all arrestees on equal footing," Maj. Op. at 56, since Cullman County sets secured bonds, knowing the indigent will be unable to afford them and obtain release, when unsecured bonds would equally secure the indigent defendants' court appearances and similarly situated nonindigent defendants are released.

For these reasons—and contrary to the Majority Opinion's conclusion—*Rainwater* does not support the Majority Opinion's determination here that Cullman County's bail practices comply with the Fourteenth Amendment. To the contrary, it shows why Cullman County's bail practices are not constitutional.

*Walker* likewise fails to support the conclusion that Cullman County's bail practices do not violate the Fourteenth Amendment. In *Walker*, as in *Rainwater* but unlike here, we were faced with only a facial challenge to Calhoun County's standing bail order. 901 F.3d at 1267 n.13. We applied rational-basis scrutiny to Calhoun County's standing bail order because the provisions of that order did not cause the *Walker* plaintiffs to suffer "an absolute deprivation on account of wealth." *Id.* at 1266 n.12.

But we were careful to distinguish the circumstances in *Walker* from the facts of *ODonnell*, where the Fifth Circuit applied heightened scrutiny to Harris County's bail practices. *See id.* In fact, we emphasized that the Fifth Circuit, unlike the *Walker*

18-13894          ROSENBAUM, J., Dissenting          63

Court, had "extensive factual findings from the district court, resulting from a lengthy evidentiary hearing" about Harris County's actual bail practices. *Id.* As we explained in *Walker*, the *ODonnell* district court's factual findings caused the Fifth Circuit to conclude that Harris County's practices "resulted in [indefinite] detainment solely due to a person's indigency." *Id.* (quoting *ODonnell*, 892 F.3d at 161). We said that "[w]ere the facts of this case the same, Walker would have a much stronger argument that indigents in the City face an absolute deprivation on account of wealth that would trigger the *Rodriguez* exception." *Id.*

Hester's case, for reasons I've explained in Sections I and IV of this dissent, is like *ODonnell*. As in *ODonnell*, the district court here held an extended evidentiary hearing and received and reviewed many exhibits. And as the district court in *ODonnell* did about Harris County's bail practices, the district court here, based on the evidence from the hearing, made factual findings about Cullman County's actual bail practices. As I've discussed, the district court's findings here—which are not clearly erroneous—require the conclusion that Cullman County's bail practices, like those of Harris County, "result in [indefinite] detainment solely due to a person's indigency." *See ODonnell*, 892 F.3d at 161.

The Majority Opinion asserts that we never said in *Walker* that requiring indigent defendants to show that they are not a flight risk or danger to the community to secure release "would somehow result in a constitutional infirmity." Maj. Op. at 55. That's true; we didn't. But that misses the point. It's not that requiring

indigent defendants to show that they are not a flight risk or a danger to the community by itself is unconstitutional. Of course, bail systems can require indigent defendants to do that before releasing them.

But bail systems cannot require indigent defendants to make those showings when they don't require the same thing of nonindigent defendants. And they cannot refuse to release indigent defendants when they release similarly situated nonindigent defendants and have ways to release indigent defendants in a way that equally satisfies the government's interests in bail.

As for other aspects of *Walker*, the Calhoun County bail system was different from Cullman County's bail practices in other significant ways as well. Though Calhoun County allowed those defendants who could meet the bail schedule to be released immediately and required indigent defendants to undergo a hearing before they could be released, Calhoun County's system included several procedural guarantees that made those hearings meaningful—procedural guarantees that are not present in Cullman County's bail practices. For example, an indigent defendant had a right to be represented by court-appointed counsel at his bail hearing, *Walker*, 901 F.3d at 1252; his hearing (where he was represented) was held within 48 hours of his arrest, *id.*; the sole purpose of the hearing was to determine whether the defendant met the indigency standard—that is, that he earned less than 100 percent of the federal poverty guidelines (unless there was evidence he had other resources that might reasonably be used), *id.*; and if the court

18-13894            Rosenbaum, J., Dissenting            65

found he met that standard, the court had to release him on his own recognizance, without a secured bond, *id.*

None of these circumstances apply in Cullman County. In contrast, in Cullman County, an indigent defendant generally does not receive a bail hearing where he is represented by counsel for a *month* from his arrest. Instead, he has an *unrepresented* appearance before a district judge (or possibly a magistrate) within 72 hours of his arrest. The purpose of the hearing is not only to determine his indigency (by a non-specific standard) but also to determine what his bail should be (based on an unidentified standard of proof). The defendant very well may not receive notice of the purpose of that hearing. In addition, by design, the presiding judge may not ask many questions or receive much information before determining what bond or other conditions to impose. And the judge may impose a bond that he knows the defendant cannot afford to pay, effectively detaining the defendant. The judge need not state his reasons for his decision on the record, so even when the defendant receives his counseled hearing on his motion to reduce bond a month later, counsel may not know why the judge imposed the bond he did.[7]

---

[7] The Majority Opinion opines that "[r]equiring judges to make oral findings . . . would inject unnecessary procedural complication into the process." Maj. Op. at 66–67 n.10. In support of this conclusion, the Majority Opinion cites *ODonnell* for the proposition that the Fifth Circuit "decline[d] to hold that the Constitution requires the County to produce 50,000 written opinions per year to satisfy due process." *Id.* (quoting *ODonnell*, 892 F.3d at 160). Ironically,

66                    ROSENBAUM, J., Dissenting                    18-13894

These circumstances—which contrast significantly with the procedural protections Calhoun County's bail system provided—violate "[t]he fundamental requisite of due process of law," which is "the opportunity to be heard . . . at a meaningful time and in a meaningful manner." *Goldberg*, 397 U.S. at 267.  Part of that guarantee means that "[t]he opportunity to be heard must be tailored to the capacities and circumstances of those who are to be heard." *Id.* at 269.  So indigent defendants who do not receive proper notice of the purpose of the uncounseled bond hearing and of their rights at the bond hearing—and who do not receive a counseled bond hearing for up to a month—do not enjoy an opportunity to be heard at a meaningful time and in a meaningful manner.

For all these reasons, *Walker* does not support the conclusion that Cullman County's bail practices don't violate the Fourteenth Amendment.

Finally, I want to address the Majority Opinion's contention that Cullman County's 72-hour period within which it provides initial, uncounseled bond hearings is constitutionally permissible because "[i]n the federal criminal system, . . . a district court is free to

though, *ODonnell* did not impose a written-opinion requirement because it concluded that "requiring magistrates to specifically enunciate their individualized, case-specific reasons for [imposing *de facto* detention] is a sufficient remedy."  In other words, the Majority Opinion cites *ODonnell*'s determination that oral statements of reasons for bail determinations satisfy due process to hold that oral statements of reasons for bail determinations are unnecessary to satisfy due process.  I do not see how one follows the other.

18-13894          ROSENBAUM, J., Dissenting                67

delay a bail hearing by three days after an arrestee's initial appearance." Maj. Op. at 54. I do not believe that the Bail Reform Act, codified at 18 U.S.C. § 3142, necessarily establishes that Cullman County's 72-hour period is constitutional.

As relevant here, *Salerno*, 481 U.S. 739, the case involving the constitutionality of the Bail Reform Act, considered only whether the Act's provisions permitting pretrial detention based on future dangerousness were constitutional. *See id.* at 746. It did not address or have reason to contemplate whether the 72-hour period set forth in the Act is always (or even ever) permissible under due-process requirements. And resolving the issue before it did not require it to determine whether the 72-hour period satisfied due process.

But assuming for the purposes of this opinion that *Salerno* did establish that a 72-hour period does not always violate due process, I do not think it can be fairly read for the proposition that a 72-hour period never violates due process. This is so because the Bail Reform Act contains several procedural safeguards that are not always built into every bail system, and that may render the 72-hour period under the circumstances of the Bail Reform Act more constitutionally palatable than a 72-hour period might be in other circumstances. To put a finer point on it, the safeguards that the Bail Reform includes are not a part of Cullman County's bail practices.

For starters, the Bail Reform Act does not purport to generally authorize all arrestees to be held for 72 hours while awaiting

their bond hearings.  Rather, setting aside circumstances when the defendant seeks additional time to prepare for a hearing, a defendant may be held for 72 hours before his pretrial-detention hearing only in limited circumstances.  First, either the government must affirmatively move for pretrial detention, 18 U.S.C. § 3142(f)(1), (2), or the court sua sponte must determine it should consider pretrial detention, *id.* at 3142(f)(2).  Second, if the government moves for pretrial detention, one of four circumstances must exist:  (1) the defendant must be charged with a crime to which Congress has attached a presumption of serious risk of flight or danger to the community (or both), *see, e.g.*, *id.* § 3142(f)(1)(A), (B), (C) (E); (2) the defendant must be charged with a felony after conviction of at least two offenses delineated by Congress, *see id.* § 3142(f)(1)(D); (3) the government must conclude that the defendant presents "a serious risk that [he] will flee," *id.* § 3142(f)(2)(A); or (4) the government must conclude that the defendant presents "a serious risk that [he] will obstruct or attempt to obstruct justice, or threaten, injure, or intimidate, or attempt to threaten, injure, or intimidate, a prospective witness or juror," *id.* § 3142(f)(2)(B).  If the judicial officer decides a detention hearing is necessary, she must find that either the third or fourth circumstance applies.  *See id.* § 3142(f)(2).  Notably, these requirements apply equally to indigent and nonindigent defendants alike.

The upshot of this is that, unlike in Cullman County, where all indigent arrestees—regardless of the failure-to-appear or danger risk they present—are subject to up to a 72-hour period of jail

confinement before their bond hearings, only those who satisfy specific criteria that make them more likely to need to be held in pretrial detention are authorized under the Bail Reform Act to be held for 72 hours before their bail hearings.

Let me put this in further context. If, loosely translated, the Bail Reform Act's requirements applied in Cullman County, before an indigent defendant could be required to wait up to 72 hours for his bond hearing, the Sheriff would have to affirmatively seek pretrial detention for specific indigent defendants because he determined that they represented a serious risk of flight or a serious risk of danger (assuming that he also did so for nonindigent defendants—which, the facts here show he does not). That is so because—except for murder and offenses that could be charged as murder—Alabama law, unlike federal law, creates no presumptions that pretrial detention may be appropriate.

The meaningful differences between the Bail Reform Act and Cullman County's bail practices do not end there. Under the Bail Reform Act, a defendant has a right to be represented by counsel (appointed if necessary), 18 U.S.C. § 3142(f)(2)(B), at the hearing that occurs within 72 hours. As I've noted, though, Cullman County holds its bond hearings within 72 hours without appointing counsel to represent indigent defendants at those hearings.

The Bail Reform Act also provides defendants at their hearings "an opportunity to testify, to present witnesses, to cross-examine witnesses who appear at the hearing, and to present information by proffer or otherwise." *Id.* Though Cullman County's

practices involve asking indigent defendants some limited questions at their bond hearings, Cullman County forms do not require judges to allow defendants to make statements and present information by proffer or otherwise. Nor do they provide for indigent defendants to present (or cross-examine) witnesses at the hearing.

Other ways the Bail Reform Act safeguards differ from Cullman County's practices include the requirements that (1) to pretrial detain a defendant based on a finding that "no condition or combination of conditions will reasonably assure the safety of any other person and the community," the judicial officer must make her finding by "clear and convincing evidence," *id.*; and (2) the Bail Reform Act requires judges who detain defendants to issue detention orders that "include written findings of fact and a written statement of the reasons for the detention," *id.* § 3142(i)(1). In contrast, Cullman County has no standard by which the judge must find a defendant to be a danger or flight risk, and it does not require its judges to announce in any form (written or oral)—or even make, for that matter—findings of fact or reasons for the detention.

These differences in safeguards are significant—especially the right to counsel. And even setting aside the independent constitutional violations Cullman County's practices might represent, these Bail Reform Act safeguards could affect the length of the period for which a person may be constitutionally held before he has a bail (or detention) hearing. In other words, when some legislative presumption or individualized determination that a defendant may present a serious risk of flight or danger to the community

exists, and the government provides all (or some constitutionally significant combination of) the procedural protections the Bail Reform Act affords, perhaps due process is better able to tolerate the delay in the bail proceedings. Due-process-safeguard-wise, the delay may be "worth it." After all, the *Mathews v. Eldridge* balancing test has also been described as a "sliding scale." *See, e.g.*, *Walsh v. Hodge*, 975 F.3d 475, 483 (5th Cir. 2020). And if the procedural safeguards available affect how long due process allows for an arrestee to be held before his bond hearing, Cullman County's lacking protections mean due process may not tolerate a 72-hour period.

Our precedent supports the district court's conclusion here that Cullman County's bail practices violate the Fourteenth Amendment.

## V.

The Majority Opinion incorrectly concludes that the district court erred in finding a constitutional violation here. It does this because it baselessly throws out the district court's factual findings, even though no party asserts that they are clearly erroneous and the Majority Opinion does not make that finding, either. Analyzing this case based on its factual record requires the conclusion that Cullman County's bail practices violate the Fourteenth Amendment. Cullman County's practices deprive indigent defendants of pretrial release when they allow similarly situated nonindigent defendants to enjoy pretrial release, and they do not contain adequate procedural protections before depriving indigent defendants of

72                    ROSENBAUM, J., Dissenting                    18-13894

pretrial release without a meaningful opportunity to be heard for up to a month or more.  For these reasons, I respectfully dissent.